# In the United States Court of Federal Claims

Nos. 24-1057, 24-1077, 24-1144, 24-1219, 24-1398, 24-1433, 24-1461
(Filed:  6 May 2025)

```
*****************************************
MVL USA, Inc., et al.,                   *
                                         *
            Plaintiffs,                   *
                                         *          Nos.  24-1057,
v.                                       *          24-1077, 24-1144,
                                         *          24-1219, 24-1398,
THE UNITED STATES,                       *          24-1433, 24-1461
                                         *
            Defendant.                    *
                                         *
*****************************************
```

     *Dirk D. Haire*, with whom were *Joseph L. Cohen*, *Payum Sean Milani-nia*, *David Timm*, *Jane Jung Hyoun Han*, and *Michael J. Brewer*, of Fox Rothschild, LLP, all of Washington, DC, for plaintiff MVL USA, Inc., and consolidated plaintiffs Environmental Chemical Corp., JCCBG2, and Harper Construction Co., Inc.

     *Jacob W. Scott*, with whom were *Allison G. Geewax* and *Mark S. Abrajano*, of Smith Currie Oles LLP, all of Tysons, VA, for consolidated plaintiff Hensel Phelps Construction Co.

     *William P. Rayel*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Natalee A. Allenbaugh*, Trial Attorney, *Yaakov M. Roth*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, *Douglas K. Mickle*, Acting Deputy Director, *Tarrah M. Beavin*, Assistant Division Counsel, South Atlantic Division, USACE, *J. Alexandra Fitzmaurice*, Associate Counsel, NAVFAC Southeast, and *Angelina Calloway*, Assistant Regional Counsel, GSA Region 7, Greater Southwest, all of Washington, DC, for defendant.

## OPINION AND ORDER

**HOLTE, Judge.**

     In the grand ballpark of federal procurement where the game of government contracting is played, this Court stands not as commissioner of the league,[1] nor member of the Competition Committee, but only as a home plate umpire.  This Court's role behind that plate is tightly circumscribed by statute; limited to calling each pitch as it crosses the plate—ball or strike—

---

[1] The Court notes perhaps the greatest baseball commissioner was retired federal judge Hon. Kenesaw Mountain Landis, who left the bench to become the first commissioner of Major League Baseball and was dubbed "the man who rescued baseball" after the 1919 World Series scandal.  *See The Man Who Rescued Baseball*, N.Y. Times, Nov. 12, 1920.

based solely on a rulebook drafted by others. This Court cannot change the rules of the game. Rule change authority belongs squarely to others—the game's architects—tasked with shaping the complex structure of government procurement authority and policy. In this case, the Court previously called a series of balls and strikes—being mindful of the narrow strike zone and boundaries of judicial position—but is now being asked to step out from behind the plate and amend the game's regulations.

In calling previous pitches, the Court granted plaintiffs' judgment on the administrative record challenging the legal authority of federal agencies to mandate prospective contractors enter project labor agreements with unions before eligibility to bid on federal construction contracts exceeding $35 million. In assigning balls and strikes, the Court's 19 January 2025 Order held "[t]he agencies' 2024 implementation of the mandate—ignoring the agencies' own market research concluding project labor agreements would be anticompetitive—relying solely on executive order presidential policy is arbitrary and capricious" because "the functionality of the mandate as applied to the individual contracts in this case stifles competition and violates the statutory directive that agencies must promote 'full and open competition' in federal procurements."

Following the government's notice of corrective action, consolidated plaintiffs, in hopes of changing the rules of the procurement game, filed a motion for permanent injunction. The government responded with a motion to dismiss, arguing the calls of the game were clear—the corrective action renders each protest moot and the Court lacks jurisdiction to grant plaintiffs' requested relief. At oral argument, plaintiffs asserted greater bid protest jurisdiction, likening the judiciary's role to "calling balls and strikes on the other two branches [of government] and forcing . . . a proper resolution." *See infra* Section VI. The Court's statutorily prescribed role, however, is much narrower than plaintiffs assert. As a home plate umpire, the Court is tasked with adjudicating individual bid protests, not setting procurement policy—specifically, "the Court's job is to call the pitch . . . one pitch after another," not adjust game regulations or widen the strike zone. *See infra* Section VI. Although plaintiffs urge the Court to prospectively call pitches that may never be thrown, or call balls and strikes in a completely different game, plaintiffs recognize the Court's 19 January 2025 call "still stands" and future parties affected by the agencies' "oscillating stance" on project labor agreement policy may seek future relief through more pitches—that is, filing separate bid protests. *See infra* Sections VI. The Court may disagree with the broadness of the Executive's implementation of its project labor agreement policy, but "the Court is limited to the jurisdiction granted to it by Congress," and redefining the procurement policy rulebook is decidedly a task reserved for other branches of government. *See infra* Section VII. In its limited role, the Court can only call balls and strikes for the pitches thrown and ensure the rules of the game—as written—are followed.[2] For the following reasons, the Court denies plaintiffs' Motions for Permanent Injunction and grants the government's Motion to Dismiss.

---

[2] As stated by Chief Justice John G. Robert, Jr., at his Supreme Court confirmation hearing: "Judges are like umpires. Umpires don't make the rules, they apply them. The role of an umpire and judge is critical. They make sure everybody plays by the rules, but it is a limited role." *Confirmation Hearing on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States*, Hearings before the Committee on the Judiciary, United States Senate, 109th Congress, U.S. Government Printing Office, 2005, 55–56.

## I.    Factual Background

The Court begins with a brief overview of the Biden Administration's Executive Order ("EO") 14063 and subsequent federal procurement regulations implementing the EO, requiring project labor agreements ("PLAs") on all federal construction contracts exceeding $35 million— including the seven contracts at issue in this case.  The Court then provides a chronology of the corrective action taken by each agency following the Court's 19 January 2025 decision.

### A.    The Court's 19 January 2025 Decision Regarding Motions for Judgment on the Administrative Record

In 2022, President Biden issued EO 14063, Use of PLAs for Federal Construction Projects.  *See* Exec. Order No. 14063, 87 Fed. Reg. 7363 (Feb. 9, 2022).  The EO mandated agencies to include PLAs with "one or more appropriate labor organizations" in "large-scale" government construction projects exceeding $35 million.  *See id*. at 7363–64.  The EO, despite mandating PLAs for all government construction projects over $35 million, provided narrow exceptions to the PLA requirement under certain circumstances.  *See id*. at 7364.  As explained in more detail in the Court's 19 January 2025 decision, President Biden's EO constituted a departure from the neutral or pro-PLA approaches taken by prior presidential administrations.  *See MVL USA*, 174 Fed. Cl. at 443–46 (detailing history of presidential administrations' treatments of PLAs for the past thirty years).

Section 8 of the EO required the Federal Acquisition Regulation ("FAR") Council to propose regulations implementing the EO within 120 days, evaluate comments, and promptly issue a final rule.  *See* Exec. Order No. 14063, 87 Fed. Reg. 7363 (Feb. 9, 2022).  On 22 December 2023, the FAR Council promulgated a final rule implementing EO 14063, mandating "every contractor and subcontractor engaged in construction on the project agree, for that project, to negotiate or become a party to a PLA with one or more labor organizations."  *See* Use of PLAs for Federal Construction Projects, 88 Fed. Reg. 88708, 88723 (Dec. 22, 2023) (incorporated in FAR pts. 1, 7, 22, 36, and 52); *see also* FAR 52.222-33 (Notice of Requirement for PLA); FAR 52.222-34 (PLA).

As explained in the Court's 19 January 2025 decision, the agencies implemented the PLA requirement in 2024 by requiring PLAs in solicitations for large scale construction projects exceeding $35 million, relying solely on the EO and FAR rules, and ignoring the agencies' own market research concluding PLAs would be anticompetitive.  *See MVL USA*, 174 Fed. Cl. at 467–70.  Consolidated plaintiffs brought seven bid protests challenging the agencies' PLA requirements as arbitrary and capricious and violative of federal procurement statutes.  *See id.* at 17–21.  Following motions for judgment on the administrative records ("MJAR") briefing and oral argument, on 19 January 2025, the Court granted plaintiffs' MJAR and ordered the parties to file a joint status report ("JSR") "detailing the agencies' proposed timeframe required to properly address *each* contract" consistent with the Court's decision.  *See MVL USA*, 174 Fed. Cl. at 474–75 (emphasis added).

### B.  Agencies' Corrective Action Following the Court's 19 January 2025 Decision

Prior to the Court's 19 January 2025 decision as to the seven consolidated protests at issue, the Court stayed five directly related protests "pending its resolution of the seven consolidated cases." *See* 14 Jan. 2025 Order Staying Case at 1, *Harper Constr. Co., Inc. v. United States*, No. 24-2055 (Fed. Cl. Dec. 13, 2024), ECF No. 10; 7 Oct. 2024 Order Staying Case, *Harper Constr. Co., Inc. v. United States*, No. 24-1532 (Fed. Cl. Sept. 30, 2024), ECF No. 10; 25 Oct. 2024 Order Staying Case, *W.M. Jordan Co., Inc. v. United States*, No. 24-1648 (Fed. Cl. Oct. 15, 2024), ECF No. 11; 14 Jan. 2025 Order Staying Case, *Harper Constr. Co., Inc. v. United States*, No. 25-36 (Fed. Cl. Jan. 1, 2025), ECF No. 9; 14 Jan. 2025 Order Staying Case, *Harper Constr. Co., Inc. v. United States*, No. 24-2054 (Fed. Cl. Dec. 13, 2024), ECF No. 10. Of the twelve challenges to the PLA mandate before the Court, plaintiffs in the five directly related protests filed notices of voluntary dismissal without prejudice following the 19 January 2025 decision. *See* Pl.'s Notice of Voluntary Dismissal, *Harper Constr. Co., Inc. v. United States*, No. 24-1532 (Fed. Cl. Sept. 30, 2024), ECF No. 13; Pl.'s Notice of Voluntary Dismissal, *Harper Constr. Co., Inc. v. United States*, No. 24-2055 (Fed. Cl. Dec. 13, 2024), ECF No. 12; Pl.'s Notice of Voluntary Dismissal, *W.M. Jordan Co., Inc. v. United States*, No. 24-1648 (Fed. Cl. Oct. 15, 2024), ECF No. 13; Pl.'s Notice of Voluntary Dismissal, *Harper Constr. Co., Inc. v. United States*, No. 25-36 (Fed. Cl. Jan. 1, 2025), ECF No. 12; Pl.'s Notice of Voluntary Dismissal, *Harper Constr. Co., Inc. v. United States*, No. 24-2054 (Fed. Cl. Dec. 13, 2024), ECF No. 12.

Additionally, in four (out of the twelve) challenges, the agencies cancelled the contracts and have either resolicited or indicated plans to resolicit the solicitations without a PLA requirement consistent with the 19 January 2025 decision. *See* Gov't's MTD, App. at 5–6 (14 Feb. 2025 Amendment Cancelling Army Corps Solicitation for Consolidated Rigging Facility at Joint Base Lewis McChord in Washington), 7–8 (14 Feb. 2025 Amendment Cancelling Army Corps Solicitation for Cyber & DoD Information Network Facility (Signal School) at Fort Eisenhower in Georgia), 9 (14 Feb. 2025 Amendment Cancelling Army Corps Solicitation for Lab and Lab Annex Buildings for the Department of Agriculture in Alabama), 12 (Notice of Cancellation of GSA Solicitation for Bridge of the Americas Land Port of Entry Modernization Act in Texas), ECF No. 112-1. In the final three challenges, the agencies amended the solicitations to remove the PLA requirement. *See id.* at 23–24 (11 Feb. 2025 Amendment 1 to NAVFAC Solicitation for Engineering Test Facility at Cape Canaveral Space Force Station in Florida), 45–55 (19 Feb. 2025 Amendment 3 to Army Corps Solicitation for KC-46 Two-Bay Maintenance/Fuel Cell Hangar at March Air Force Reserve Base in California), 94 (20 Feb. 2025 Amendment 4 to Army Corps Solicitation for Consolidated Communications Facility at Patrick Space Force Base in Florida). To date, in each of the twelve PLA challenges before the Court, the solicitations have either been canceled or amended to remove the PLA requirement, or the protests have been voluntarily dismissed. The Court therefore details the corrective action taken in each of the consolidated cases since the Court's 19 January 2025 decision on the merits.

On 7 February 2025, pursuant to FAR 1.404(b) and 48 C.F.R. § 201.404(b), the Department of Defense's ("DoD") Principal Director of Defense Pricing, Contracting, and Acquisition Policy issued a DoD-wide FAR class deviation directing:

Effective immediately, contracting officers shall not use project labor agreements for large-scale construction projects, implemented at Federal Acquisition

Regulation [] subpart 22.5 and 36.104(c). Contracting officers shall amend solicitations to remove project labor agreement requirements, including any solicitation provisions and contract clauses prescribed at FAR 22.505.

Gov't's Mot. to Dismiss and Resp. to Pls.' Mot. for Permanent Inj. ("Mot. for PI") ("MTD"), App. at 1 (7 Feb. 2025 DoD FAR Class Deviation Waiver of Project Labor Agreement Requirements), ECF No. 112-1. On 12 February 2025, pursuant to FAR 22.504(d), the General Service Administration's ("GSA") Senior Procurement Executive issued a class exception from the FAR 22.503(b) requirement to mandate PLAs for all land port of entry ("LPOE") construction projects, effective immediately. *See* Gov't's MTD, App. at 2–4 (12 Feb. 2025 GSA Class Exception Under FAR 22.504(d)) ("This class exception is effective immediately and remains in effect until rescinded."). In explaining its basis for granting the class exception, GSA stated in relevant part:

> Requiring a PLA on LPOE projects would not advance the [f]ederal [g]overnment's interests in achieving economy and efficiency in [f]ederal procurement because the need for LPOE modernizations is of an unusual and compelling urgency and requiring a PLA would be impracticable.

> A current administration priority is to remedy the emergency on the United States borders. . . . The GSA LPOE projects are essential to helping ensure legal entry into the United States. . . . GSA has found that including a PLA requirement for projects in remote rural locations, without strong existing union presence, causes delays. . . . These delays allow additional time for potential contractors to develop internal capacity to manage PLAs, but also increase risk of bid protests. . . .

*Id.* at 2–3. Noting "[t]his class exception applies to large scale construction projects for LPOE construction projects," GSA concluded: "Based on GSA's experience, applying the PLA requirement in LPOE project locations along the Northern and Southern borders substantially increases the likelihood that GSA will not receive adequate competition." *See id.* at 4.

Consistent with the DoD class deviation, on 14 February 2025, the United States Army Corps of Engineers ("Army Corps") canceled Solicitation No. W912DW24R0024, protested by plaintiff MVL USA, Inc. ("MVL"). *See id.* at 5–6 (14 Feb. 2025 Amendment Cancelling Army Corps Solicitation) ("Pursuant to FAR 15.305(b), this solicitation is hereby cancelled. The [g]overnment intends to revise the requirements and resolicit at a future date."). The same day, the Army Corps canceled Solicitation No. W912HN24B4002, protested by plaintiff Environmental Chemical Corporation ("ECC"). *See id.* at 7–8 (14 Feb. 2025 Amendment Cancelling Army Corps Solicitation) ("The purpose of this amendment is to cancel this solicitation. . . . In this case, the revised specifications entail the removal of the PLA requirement consistent with the ruling of the Court of Federal Claims and in accordance with the Class Deviation – Waiver of Project Labor Agreement Requirements."). Also, on 14 February 2025, the Army Corps canceled Solicitation No. W9127824R0013, solicited by JCCBG2. *See id.* at 9 (14 Feb. 2025 Amendment Cancelling Army Corps Solicitation) ("The subject solicitation is hereby canceled."). The same day, GSA canceled Solicitation No. 47PH0824R0007, protested by Hensel Phelps Construction Company ("HPCC"). *See* Gov't's

MTD, App. at 12 (Notice of Cancellation of GSA Solicitation No. 47PH0824R0007) ("The Bridge of the Americas Land Port of Entry Modernization solicitation is being cancelled. . . . GSA will be conducting market research to assess the specific needs of this project related to the PLA requirement and anticipates posting a new solicitation in upcoming months.").

In addition to the cancellations, three of the solicitations were amended to remove the PLA requirement. *See supra.* On 11 February 2025, NAVFAC amended Solicitation No. N6945024R0065, protested by HPCC. *See* Gov't MTD, App. at 23–24 (11 Feb. 2025 Amendment 1 to NAVFAC Solicitation No. N6945024R0065) ("Remove the Project Labor Agreement (PLA) requirement in its entirety from this procurement in accordance with Class Deviation . . . ."). On 19 February 2025, the Army Corps amended Solicitation No. W912QR24R0034, protested by Harper. *See id.* at 45–55 (19 Feb. 2025 Amendment 3 to Army Corps Solicitation No. W912QR24R0034) ("Project Labor Agreement has been removed." (emphasis omitted)). The next day, the Army Corps amended Solicitation No. W9127823R0115, protested by HPCC. *See id.* at 94 (20 Feb. 2025 Amendment 4 to Army Corps Solicitation No. W9127823R0115).

## II.    Procedural History

 On 25 October 2024, all seven consolidated plaintiffs filed their MJARs. *See* MVL's MJAR, ECF No. 64; ECC's MJAR, ECF No. 65; JCCBG2's MJAR, ECF No. 66; Harper's MJAR, ECF No. 67; HPCC's GSA MJAR, ECF No. 68; HPCC's NAVFAC MJAR, ECF No. 69; HPCC's USACE MJAR, ECF No. 70. On 22 November 2024, the government filed its Cross-Motion and Response to plaintiffs' MJARs. *See* Gov't Cross-MJAR and Resp., ECF No. 73. On 9 December 2024, MVL, ECC, JCCBG2, and Harper filed their Reply in Support of their MJARs and Response to the government's Cross-MJAR. *See* Pls.' Reply and Resp., ECF No. 79. Contemporaneously, JCCBG2 filed a separate additional response addressing the government's arguments as to the timeliness of JCCBG2's protest. *See* JCCBG2's Resp. to Gov't Cross-MJAR at 1–4, ECF No. 78. That day, Hensel filed its combined Reply in Support of its three separate MJARs and Response to the government's Cross-MJAR. *See* HPCC's Reply and Resp., ECF No. 80. On 23 December 2024, the government filed its Reply in Support of its Cross-MJAR. *See* Gov't Reply, ECF No. 84.

On 16 January 2025, the Court held oral argument. *See* 16 Dec. 2024 Order, ECF No. 81; 16 Jan. 2025 Oral Arg. Tr., ECF No. 95. Subsequently, on 19 January 2025, the Court issued a sealed opinion and order granting plaintiffs' MJARs, denying the government's Cross-MJAR, and ordering the parties to file a JSR and revised redacted briefs. *See* 19 Jan. 2025 Sealed Op. and Order, ECF No. 96; *MVL USA*, 174 Fed. Cl. 437. Two days later, the Court issued a reported public version of its opinion after allowing the parties to submit proposed redactions to the Court's sealed opinion. *See* 21 Jan. 2025 Reported Op. and Order, ECF No. 97; *MVL USA*, 174 Fed. Cl. 437. On 10 February, the parties filed a JSR "explain[ing] the agencies' plan for each solicitation involved in this case, in light of the Court's opinion." *See* 10 Feb. 2025 JSR at 1, ECF No. 110. The JSR further stated the agencies intended to either cancel or amend all seven solicitations at issue in the consolidated cases consistent with the 19 January 2025 decision and proposed a joint briefing schedule regarding "plaintiffs' proposed injunctive relief." *See id.* at 1–2. The same day, MVL, ECC, Harper, and JCCBG2 filed a Motion for Permanent

Injunction "seeking a permanent injunction rescinding" EO 14063 and the corresponding FAR Clauses. *See* Pls.' Mot. for PI at 1, ECF No. 111. Although HPCC did not join this Motion, the Motion noted "HPCC agrees with consolidated plaintiffs MVL, ECC, JCCBG2, and Harper with respect to the request for a permanent injunction as set forth herein." *See id.* at 1, n.1.

On 24 February 2025, the government filed a motion to dismiss pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") and responded to plaintiffs' Motion. *See* Gov't MTD, ECF No. 112. On 3 March 2025, plaintiffs MVL, ECC, Harper, and JCCBG2 filed a reply and response to the government's Motion to Dismiss. *See* Pls.' Reply, ECF No. 113. On 19 March 2025, plaintiffs HPCC filed a response to the government's Motion to Dismiss and Response to plaintiffs' Motion for Permanent Injunction. *See* HPCC's Resp. HPCC specifically requests "the Court grant permanent injunctive relief to remedy the government's violation of CICA through the imposition of the PLA mandate, including permanently prohibiting the government from imposing any PLA requirement in the solicitations that HPCC has protested." *See id.* at 10. On 28 March 2025, the government filed its combined Reply to plaintiffs' Responses. *See* Gov't's Reply to Pls.' Resp. to Gov't's MTD ("Gov't's Reply"), ECF No. 116. On 17 April 2025, the Court held oral argument. *See* 31 Mar. 2025 Scheduling Order, ECF No. 117; *see also* 17 Apr. 2025 Oral Arg. Tr. ("Tr."), ECF No. 119.

After oral argument, on 24 April 2025, the government filed "notice of an April 23, 2025 revision to the [DoD] class deviation that was included in the appendix in support of [its] [M]otion to [D]ismiss."[3] *See* Gov't's Notice of Revised DoD Class Deviation ("Notice"), ECF No. 120; Gov't's Notice, Revised DoD Class Deviation (23 Apr. 2025 Class Deviation—Waiver of Project Labor Agreements) at 1 ("Effective immediately, this class deviation revises and supersedes Class Deviation 2025-O0002, issued on February 7, 2025."), ECF No. 120-1. The revised DoD class deviation cited the 19 January 2025 decision, stating: "This class deviation is needed to ensure contracting officers are able to award contracts for Federal large-scale construction projects in accordance with [the Court of Federal Claims'] MVL decision." *See* Gov't's Notice, Revised DoD Class Deviation (23 Apr. 2025 Class Deviation—Waiver of Project Labor Agreements) at 1.

## III.    Relevant Proceedings in Other Courts

As part of the procedural background to the instant case, and relevant to the arguments regarding jurisdiction, the Court also reviews two ongoing proceedings in other courts. In a 2024 case, plaintiff Associated Builders and Contractors ("ABC") filed an action in the United States District Court for the Middle District of Florida seeking declaratory and injunctive relief

---

[3] Importantly, the Notice stated:

> The revised deviation clarifies although contracting officers shall issue solicitations without PLA requirements and remove PLA requirements from any pending solicitations, they are not prohibited from accepting an offer that includes or is based on pricing conditioned on a contractor-proposed PLA. The revised deviation also explains the basis of the class deviation, i.e., the need to ensure that DoD contracting officers are able to award contracts for Federal large-scale construction projects in accordance with the reasoning in the Court's January 2025 decision in this case.

*See* Gov't's Notice at 1 (cleaned up).

from the same PLA requirement contained in the 2022 EO. Pls.' Compl., *Ass'n Builders & Contractors Florida First Coast Chapter v. Gen. Servs. Admin.*, No. 3:24-cv-318-WWB-MCR (M.D. Fla.) ("*First Coast*"), ECF No. 1. In a second 2025 case, on 9 April 2025, plaintiffs North America's Building Trades Unions ("NABTU") and the Baltimore-D.C. Metro Building and Construction Trades Council ("Baltimore-DC Council") filed suit against the DoD and GSA in the United States District Court for the District of Columbia to enjoin DoD memoranda overriding the same PLA requirement challenged here. Pls.' Compl., *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, No. 1:25-cv-1070-RC ("*NABTU*"), ECF No. 1. Despite taking opposite positions on the enforceability of the PLA mandate and originating outside the bid protest context, both speak to jurisdiction requirements for injunctive relief.

ABC is a construction industry trade association "which represents more than 23,000 member contractors and related firms," including at least plaintiff Hensel Phelps. *See* Pls.' Compl. at 5, 8, *First Coast*, ECF No. 1. On 28 March 2024, ABC filed an action in the Middle District of Florida seeking declaratory and injunctive relief from the same PLA requirement contained in EO 14063. *See id.* at 1. Plaintiffs sued to set aside EO 14063 and the FAR Rules implementing the EO, arguing they violated CICA, among other statutes. *See* 28 Mar. 2025 Order at 3, *First Coast*, ECF No. 58. Unlike this case, however, ABC sought permanent injunctive relief from enforcement of EO 14063 from the outset. *See* Pls.' Compl. at 17, 47, *First Coast*, ECF No. 1. On 26 April 2024, ABC moved to preliminarily enjoin EO 14063. Pls.' Mot. for Prelim. Inj. and Mem. of Law in Supp. Thereof, *First Coast*, ECF No. 18.

On 28 March 2025, the District Court for the Middle District of Florida denied plaintiffs' motion for preliminary injunction. *See* 28 Mar. 2025 Order, *First Coast*, ECF No. 58. After noting the Eleventh Circuit has grown "both weary and wary of nationwide injunctions," *id.* at 5, n.2 (cleaned up), the court considered plaintiffs' likelihood of success on the merits, *see id.* at 9–12. Relying on the Court's 19 January 2025 decision, the district court agreed "plaintiffs have established a likelihood of success on the merits of their CICA claim" because "the PLA Rule violated the CICA's full and open competition requirement." *See id.* at 10–12 (citing *MVL USA, Inc. v. United States*, 174 Fed. Cl. 437, 469–70 (2025)) ("This Court is persuaded by the reasoning set forth by the courts in *MVL* and *NGS* and finds that Plaintiffs have established a likelihood of success on the merits of their CICA claim."). The district court then dismissed the government's counterargument asserting the Court's reasoning in the 19 January 2025 decision was inapplicable outside the bid protest context. *See id.* at 10–12. While acknowledging the Court's 19 January 2025 decision was "heavily informed" by ongoing bid protests, the district court found "the evidence before [it] is that [the government's] course of dealing has rendered the exceptions to the PLA Rule 'functionally meaningless.'" *Id.* at 11 (quoting *MVL*, 174 Fed. Cl. at 469). The district court also supported the Court's interpretation of *National Government Services, Inc. v. United States*, 923 F.3d 977 (Fed. Cir. 2019), finding the PLA Rule was not "akin to a permissible capability or experience requirement." *See* 28 Mar. 2025 Order at 11–12, *First Coast* (noting "the Court disagrees that *NGS* leads to a contrary conclusion or was misapplied by the *MVL* court"), ECF No. 58.

In denying plaintiffs' request for injunctive relief, the district court noted plaintiffs "failed to come forward with sufficient evidence and argument to . . . determin[e] that irreparable harm exists in this case[.]" *See id.* at 13–18. The district court found no irreparable harm

because plaintiffs "have fallen short" of contesting that "bidding members have adequate relief through individual bid protests before the Court of Federal Claims." *See id.* at 16–18. Nor did plaintiffs show that the fear "subcontractors will not be able to seek or obtain work on PLA covered projects" was more than speculation. *See id.* at 18. As such, the district court denied plaintiffs' motion for preliminary injunction. *See id.* The parties' cross-motions for summary judgment, however, remain pending. *See* Pls.' Mot. for Summ. J., *First Coast*, ECF No. 41; Gov't's Mot. for Summ. J., *First Coast*, ECF No. 42.

In a second case filed on 9 April 2025, NABTU and the Baltimore-DC Council filed suit against the DoD and GSA in the United States District Court for the District of Columbia. *See* Pls.' Compl., *NABTU*, No. ECF No. 1. There, plaintiffs allege DoD memoranda "overriding" EO 14063's PLA "requirement" violated the Administrative Procedure Act ("APA") because the memoranda are both arbitrary and capricious as well as "contrary to the plain language of" EO 14063, which "has not been revoked." *See d.* at 2–3. Plaintiffs in *NABTU* seek a declaration that the DoD memoranda are unlawful and an injunction against enforcement of the memoranda. *See id.* at 22–23. On 10 April 2025, plaintiffs further moved to preliminarily enjoin enforcement of the DoD memoranda to keep the PLA requirement in place. *See* Pls.' Mot. for a Prelim. Inj. at 1–2, *NABTU*, ECF No. 5. Plaintiffs' Motion remains pending. *See id.*

## IV.    Parties' Arguments

Seeking permanent injunctive relief, consolidated plaintiffs MVL, ECC, Harper, and JCCBG2 urge the Court to "issue permanent injunctive relief that will bring consistency and compliance" with the Court's 19 January 2025 decision and "avoid a never-ending loop of solicitations containing illegal PLA requirements and a bid protest game of Whack-a-mole to stop the continued illegal solicitation requirements." *See* Pls.' Mot. for PI at 1–2. Specifically, plaintiffs argue the Tucker Act expressly authorizes the Court to award any relief for alleged violations of law in connection with federal procurements, "*including injunctive relief.*" *See id.* at 2 (emphasis in original). According to plaintiffs, "[t]his Court is the only tribunal" available to seek enforceable bid protest relief under the Tucker Act, so "[i]t is thus within this Court's exclusive jurisdiction to render judgment on [p]laintiffs' claims alleging violations of the Competition in Contracting Act ('CICA') in connection with each of the procurements containing the PLA Requirements." *See id.* at 2–3. Further, plaintiffs argue the Federal Circuit's decision in *Boeing Co. v. United States*, 119 F.4th 17 (Fed. Cir. 2024), "regarding this Court's ability to review the validity of regulations in contract disputes should be extended to bid protest disputes brought under 28 U.S.C. § 1491(b)." *See* Pls.' Mot. for PI at 6. Recognizing "this Court lacks jurisdiction to hear challenges to the validity of regulations when those challenges do not involve contract-related claims," plaintiffs argue, "when such challenges do involve contract-related claims, this Court possesses exclusive jurisdiction[.]" *Id.* at 5. Plaintiffs conclude: "Unlike non-contract cases, there is no other alternative such as the district courts for claims subject to the [Contracts Dispute Act ('CDA')]. The purpose of centralizing the resolution of government contract disputes in the Court of Federal Claims, rather than in district court, is to ensure national uniformity in government contract law." *Id.* at 5–6 (quoting *Boeing*, 119 F.4th at 24) (cleaned up). Plaintiffs reason, since the government's ability "to restrict competition to contractors who enter PLAs—is inextricably intertwined with the validity of the PLA Requirements themselves," the Court of Federal Claims "has exclusive jurisdiction to

resolve these bid protests and determine the validity of the PLA Requirements." *Id.* at 7 (emphasis omitted).  Finally, plaintiffs argue since they have succeeded on the merits of the case, they are entitled to permanent injunctive relief.  *See id.* at 7–9.  According to plaintiffs, "[a]bsent permanent injunctive relief, [p]laintiffs will suffer irreparable harm if the [g]overnment continues to mandate through the FAR that procurement agencies include the unlawful PLA Requirements in all large-scale construction solicitations on which [p]laintiffs may bid in future."  Pls.' Mot. for PI at 8.  Plaintiffs conclude "it is in the public interest to maintain public confidence in the procurement process," and the government "faces no hardship" from permanent injunctive relief because it "may use lawful alternatives to restrict competition."  *Id.* at 8–9.

In response, the government moves to dismiss this case as moot.  *See* Gov't MTD at 1. Pointing to agency action since the 19 January 2025 decision, the government argues because all solicitations at issue in this case have either been cancelled or amended to remove the PLA requirement, each of the consolidated cases should be dismissed on mootness grounds.  *See id.* at 7.  The government argues mootness is a threshold jurisdictional issue, explaining "[i]t is well-settled that cancellation of the solicitation at issue moots a bid protest."  *Id.* (citation omitted).  As such, the government argues the four consolidated cases with cancelled solicitations are moot.  *See supra* Section I.B.  The government explains "[t]here is no reasonable expectation that the new solicitations for these construction projects will contain a PLA requirement in violation of the Court's interpretation of CICA" given "DoD's FAR deviation prohibiting DoD entities from requiring PLAs in large-scale construction solicitations, and GSA's class exception to the PLA mandate for land port of entry construction projects."  *Id.* at 7–8.  In the government's view, "if plaintiffs are dissatisfied with future solicitations for these projects, they may, of course, challenge the new solicitations."  *Id.* at 8 (cleaned up).  As to the three consolidated cases where the solicitations were amended, the government argues there is "no reasonable expectation that [the Army Corps] or NAVFAC will reverse course, especially considering DoD's FAR deviation[.]"  *Id.*  According to the government, "the amendments have completely and irrevocably eradicated the effects of the allegedly illegal PLA requirements," so "Harper and HPCC are now able to compete for the contracts without being subject to PLA requirements," thereby making plaintiffs' protests moot and subject to dismissal.  *See id.*

Even if the consolidated cases cannot be dismissed on mootness grounds, the government argues there are at least three additional reasons why the Court should deny plaintiffs' requested relief:  (1) "this Court lacks the authority to direct the rescission of regulations and executive orders in bid protests;" (2) "this Court did not hold [EO] 14063 and the regulations implementing it facially violate CICA, but instead held that the agencies' application of those regulations to seven specific procurements violates CICA;" and (3) "movants have failed to demonstrate irreparable harm in the absence of the injunction that they seek" because all solicitations have either been cancelled or amended.  Gov't MTD at 8–9.  First, the government argues "this Court lacks the authority [to] grant this or any similar relief in a bid protest," given the Federal Circuit stated this Court lacks "the authority to invalidate properly promulgated regulations of an Executive Branch agency" in a bid protest.  *Id.* at 10 (quoting *DGR Associates Inc. v. United States*, 690 F.3d 1335, 1341 (Fed. Cir. 2012)).  Citing other Federal Circuit authority, the government argues "[c]hallenges to the validity of a regulation governing a procurement must be brought in federal district court under the [APA]."  *Id.* (quoting *Land Shark Shredding LLC v. United States*, 842 F. App'x 589, 593 (Fed. Cir. 2021) (alteration in original)).  The government

concludes the Court's "bid protest jurisdiction does not extend to striking down regulations." *Id.* (internal quotation and citation omitted).

Next, countering plaintiffs' use of *Boeing* to argue the Court can determine the validity of regulations, the government argues "*Boeing* supports [its] position." *Id.* at 10. Per the government, *Boeing* concluded bid protests cases, such as *Land Shark* and *Southfork Systems, Inc. v. United States*, 141 F.3d 1124, 1135 (Fed. Cir. 1998), "are distinguishable from CDA claims for purposes of analyzing whether this Court may determine the validity of a regulation." Gov't MTD at 11. The government argues this must be true because "the same judge authored both the *Land Shark* and *Boeing* opinions, with no suggestion that they were inconsistent." *Id.* (citations omitted). Recognizing "this Court may consider the validity of a regulation in this manner in a CDA case, there is no suggestion in *Boeing* that the Court of Federal Claims could direct the [g]overnment to rescind a regulation in a CDA case or categorically enjoin the enforcement of a regulation, such that the regulation would be inapplicable to *other contracts with other [g]overnment contractors*." *Id.* at 12 (emphasis in original). "Accordingly, even if the reasoning of *Boeing* were extended to bid protests," the government argues, "it would not give this Court authority to direct the rescission of regulations and executive orders." *Id.* In support of this argument, the government cites the "Middle District of Florida challenging the validity of EO 14063 and the FAR provisions that movants are seeking to enjoin here." *Id.* (citing *First Coast*); *see supra* Section III. "Even if the Court could direct the rescission of regulations and executive orders in a bid protest," the government argues "there would be no basis to do so in this case, because the Court has not determined EO 14063 and its implementing regulations are facially invalid." *Id.* at 13–14 (cleaned up).

Finally, the government argues plaintiffs' requested relief "must also be denied because they have failed to demonstrate irreparable harm in the absence of an injunction" as each of the challenged solicitations "have either been cancelled or amended to remove the PLA requirements." Gov't MTD at 14–15. Given DoD class FAR deviation prohibiting DoD entities from requiring PLAs in large-scale construction solicitations, the government argues "there is no reason to believe that DoD will require PLAs in any future solicitations based upon the authorities that movants seek to enjoin." *Id.* at 15. Arguing HPCC's counsel's words underscore the government's position, the government quotes a statement attributed to HPCC's counsel on the Smith Currie website: "DOD's class deviation and GSA's class exception likely spell the death of the PLA requirement." *Id.* at 16 (citation omitted). The government reiterates "if agencies decide to include PLA requirements in future solicitations for large-scale construction contracts in a manner that movants believe to be illegal, movants may protest the solicitations at that time." *Id.* Accordingly, the government argues "a permanent injunction is not now needed to guard against any present or imminent risk of likely irreparable harm." *Id.* (citation omitted).

In response, plaintiffs MVL, ECC, Harper, and JCCBG2 argue the government misconstrues the Court's ruling to conclude the Federal Property and Administrative Services Act ("FPASA") authorizes the PLA requirements. *See* Pls.' Reply in Supp. of Mot. for PI ("Pls.' Reply") at 3, ECF No. 113. Per plaintiffs, "the Court rightly prohibited the [g]overnment from applying the PLA Requirements because the PLA Requirements themselves lack a statutory basis and violate federal law." *Id.* Arguing the Court "agreed" with plaintiffs' argument

- 11 -

"merely citing FPASA does not provide sufficient legal authority to ground presidential policy without specific statutory reference," plaintiffs claim the Court "left to Congress the matter of addressing the President's authority under FPASA to issue expansive construction industry labor policies." *Id.* at 4 (cleaned up). Plaintiffs argue "any future requirement for PLAs on all large-scale construction projects procurements would need to be justified under CICA's exceptions to full and open competition—not under the PLA Requirements or on a class basis." *Id.* at 5. Plaintiffs argue the self-executing provision of EO 14,063 states the EO cannot violate existing law, "which means that the EO, by its own terms, cannot apply to any existing or future federal procurement[s] because [the PLA requirements] have been deemed by this Court to be violative of CICA's full and open competition requirements." *Id.* at 6.

Plaintiffs next argue this case is not moot because the government "is continuing to evaluate the applicability of the PLA Requirements in derogation of the Court's Ruling, thus creating the reasonable expectation . . . the [g]overnment will continue to violate CICA." *Id.* at 7. Claiming the government "bears the burden of demonstrating that such agency action moots a pending case," and "the burden of demonstrating mootness is a heavy one," plaintiffs conclude the government has failed to follow the Court's decision or demonstrate there is no reasonable expectation CICA violations will recur. *See id.* (cleaned up). Plaintiffs claim "[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Pls.' Reply at 8–9 (citation omitted). Quoting the government's plans to cancel or amend all solicitations at issue in this case, plaintiffs argue "there is a reasonable expectation" the agencies "will continue to employ the PLA Requirements' exception procedures (instead of CICA's procedures to properly forgo full and open competition." *Id.* at 9. Plaintiffs note the Department of Veterans Affairs ("VA") recently issued a class deviation to waive all PLAs only to reverse course and reinstate all PLA language and clauses days later. *See id.* at 10–11. According to plaintiffs, "[a]bsent clear direction, it is also possible that the [g]overnment could likewise rescind the [DoD's] class FAR deviation[.]" *Id.* at 12. Plaintiffs conclude "this [c]ase is not moot," as "there is a likely expectation that the CICA violations will recur" without "a decree enjoining the [g]overnment's continued violations of the most fundamental precept of CICA—full and open competition." *Id.*

Moreover, plaintiffs argue the Court has jurisdiction to afford plaintiffs their requested relief under the Tucker Act. *See id.* at 12–18. Given the Court's jurisdiction over bid protests seeking equitable relief, and because the Tucker Act provides the Court with jurisdiction to afford "any relief that the court considers proper" when reviewing "any alleged violation of statute or regulation in connection with a procurement," plaintiffs argue "Congress has expressly authorized the Court to afford 'any relief' it deems proper, which necessarily includes" plaintiffs' requested relief. Pls.' Reply at 12–13 (citing 28 U.S. 1491(b)(1)–(2)) (emphasis omitted). Plaintiffs read *Boeing* as recognizing this Court's "jurisdiction under the CDA to resolve contract disputes and to determine the validity of regulations that are the basis of such disputes." *Id.* at 14. (emphasis omitted). Plaintiffs reject the government's reading of *Boeing* to draw a distinction between CDA cases and bid protests, arguing under the government's reading protesters would be required to file a pre-award bid protest before this Court in an as-applied challenge to the specific procurement, and concurrently "file an action in a . . . [d]istrict [c]ourt challenging the validity of the underlying regulation itself." *See id.* at 15. Plaintiffs argue their reading of *Boeing* is most consistent with discouraging forum shopping and promoting

"uniformity of results." *Id.* at 15–16 (citations omitted). Plaintiffs suggest "[t]his is not a case where there is doubt about Congressional Intent." *See id.* at 16. Plaintiffs next argue *Boeing* clarified "the term 'contract case' is not limited to CDA claims," so *Boeing* should be read to include bid protests. *See id.* at 17. Per plaintiffs, because Congress gave this Court jurisdiction over bid protests, "Congress has not limited this Court's authority to review the validity of regulations in connection with bid protests." *See id.* Plaintiffs argue they will be "deprived of an adequate remedy if they cannot seek injunctive relief in this Court." Pls.' Reply at 18.

Finally, plaintiffs argue they are entitled to injunctive relief because they have: (1) succeeded on the merits of the case; (2) will suffer irreparable harm if the Court "withholds injunctive relief;" (3) the balance of hardships weigh in favor of granting injunctive relief; and (4) it is in the public interest to grant injunctive relief. *See id.* at 19 (citation omitted). As to prong two of the injunctive relief standard, plaintiffs argue "[t]he [g]overnment continues to try to apply the unlawful PLA Requirements for purposes of evaluating whether current and future solicitations should include mandatory PLAs or whether an exception should apply," thus plaintiffs will suffer irreparable harm in the future. *Id.* Arguing the balance of hardships favors injunctive relief, plaintiffs suggest injunctive relief "will provide the [g]overnment with clear directives and will reduce demonstrated confusion." *Id.* at 20. Plaintiffs maintain "the public benefits when the [g]overnment complies with procurement laws because doing so leads to better services, more competition, and less corruption." *Id.* at 21.

HPCC responded separately to the government's Motion to Dismiss, arguing the agency's "half-measures" have not eliminated the possibility the government "will continue to violate CICA" and "provide no certainty to the Court, HPCC, or any other offeror that the PLA requirement will not be again foisted upon offerors in these or other procurements." *See* HPCC's Consolidated Opp'n to Gov't MTD ("HPCC's Resp." or "Mot. for PI") at 2, ECF No. 115. Specifically, HPCC argues the agency class deviations are neither permanent nor guaranteed, providing "almost no certainty" the agencies will not reverse course as recently seen by the VA as argued by consolidated plaintiffs. *See id.* at 3. Additionally, HPCC argues "GSA has [n]ot [a]cknowledged the [i]mport of the Court's [d]ecision." *Id.* at 4. Per HPCC, the Court's decision concluded "the mandatory application of the PLA requirement is itself a violation of CICA, regardless of whether an agency later makes an exception for its application." *Id.* at 5. HPCC suggests "GSA has ignored the first element of the Court's holding—that the mandatory application of the PLA requirements violates CICA—and skipped to the second step of issuing an exception[.]" *Id.* In arguing for permanent injunction, HPCC notes it succeeded on the merits *and* the government has never addressed HPCC's entitlement to injunctive relief—and has only addressed the other plaintiffs' entitlement to injunctive relief—and has thus waived any argument against HPCC's entitlement to injunctive relief as to the other elements. *See id.* at 6. Per HPCC, it will be irreparably harmed without permanent injunction through the lost opportunity to fairly compete for a contract and to secure the resulting profit constitute irreparable harm justifying a permanent injunction. *See* HPCC's Resp. at 7. Without injunctive relief directing the government to cease the use of PLAs, HPCC argues it "will not have meaningful relief." *See id.* According to HPCC, the balance of hardships favors injunctive relief. *See id.* at 8. "Even given a fresh opportunity to assert any harm it will experience as a result of injunctive relief," HPCC argues "the government has failed to enumerate a single hardship." *Id.* "Plaintiffs, including HPCC, remain subject to the uncertain and incomplete

- 13 -

corrective actions the government has taken in response to the Court's determination that the PLA mandate violates CICA." *Id.* HPCC concludes by emphasizing CICA was implemented to ensure full and open competition, and argues "the fairness and integrity of the public procurement system will dissolve" if the government is allowed to undermine CICA "by continuing to reserve for itself the discretion to impose the illegal PLA mandate." *Id.* at 8–9. Accordingly, HPCC urges "the Court grant permanent injunctive relief to remedy the government's violation of CICA . . . including permanently prohibiting the government from imposing any PLA requirement in the [three] solicitations that HPCC has protested." HPCC's Resp. at 9.

In its Reply in Support of its Motion to Dismiss, the government addresses HPCC's separate response. *See* Gov't's Reply at 2. The government, in seeking to dismiss *all* consolidated protests, maintains the four cancelled solicitations are moot. *See id.* at 2 (citations omitted). The government reiterates "[t]here is no reasonable expectation that these [cancelled] solicitations will again contain the PLA requirements." *See id.* at 3. Addressing HPCC's arguments related to the land port of entry construction projects, the government argues speculative harm is insufficient to "keep [the] case [a]live." *Id.* at 4. Given "[t]he new solicitation will be part of a new procurement," the government argues the appropriate avenue for relief for HPCC is to "protest the terms of [the new] solicitation if [HPCC] is dissatisfied with them." *Id.* (citation omitted). The government further explains "given GSA's class exception for large-scale land port of entry contracts, the Court's opinion in this case, and GSA's previous market research for this project, it is highly unlikely that the new solicitation will contain a PLA requirement." *Id.* at 5.

The government also argues the three amended solicitations are moot because the challenged PLA requirements have been removed. *See* Gov't's Reply at 6. Noting "[t]he amendments have completely and irrevocably eradicated the effects of the allegedly illegal PLA requirements, *i.e.*, Harper's and HPCC's inability to compete for the contracts without being subject to PLA requirements," the government argues "no reasonable expectation" exists the Army Corps and NAVFAC "will reinstate the PLA requirements in these solicitations,"—thus, "there is no reasonable expectation that the alleged violations of law will recur." *Id.* Rebutting plaintiffs' arguments related to the VA rescinding its class deviation, the government explains, "DoD has not followed the VA by rescinding its FAR deviation, and there is no reasonable expectation that DoD will do so." *Id.* at 7. Pointing to the market research, the government notes even if DoD were to rescind the FAR deviation, "it is unlikely that such action would lead to the reinstatement of the PLA requirements" because after reviewing the market research in all seven cases, "the Court concluded that application of the PLA mandate . . . violated CICA." *Id.* Given the VA's use of PLA mandates was not before the Court, and "has not been subject to judicial review," then "the Court should presume [the agencies] would not reflexively reinstate PLA requirements into the amended solicitations if DoD were to rescind its FAR deviation." *Id.* The government argues just because the agencies "may theoretically further amend the solicitations or rescind the FAR deviations does not mean that the solicitation amendments removing the PLA requirements did not completely and irrevocably eradicate the effects of the initial inclusion of PLA requirements in the solicitations." *Id.* at 7–8 (citation omitted).

Next, the government avers the Court cannot and should not direct the recission of EO 14063 and its implementing regulations. *See* Gov't's Reply at 8. "Even if the Court could direct the rescission of executive orders and regulations that violate a law . . . EO 14,063 and its implementing regulations do not facially violate CICA's full and open competition requirement." *Id.* at 8. In the government's view, EO 14063 and the implementing FAR regulations "do not *per se* require agencies to impose PLA requirements in solicitations; they instead contain exceptions that permit agencies to decline to impose PLA requirements for certain projects." *Id.* Noting the PLA requirements permit an exception where requiring PLAs "would otherwise be inconsistent with Federal statutes"—which includes CICA, then the "implementing regulations cannot themselves violate CICA because they expressly provide that agencies need not require PLAs in particular procurements if doing so would violate CICA." *Id.* at 9. The government argues because the Court's decision "limited its ruling to 'the functionality of the mandate as applied to the individual contracts in this case,'" then plaintiffs misconstrue the Court's decision by arguing the regulations lack a statutory basis and violate federal law. *Id.* (citation omitted). According to the government, "it makes sense that the Court declined to decide this issue, given the Court's focus on the functionality of the mandate as applied to the individual contracts in this case." *Id.* (cleaned up). The government claims plaintiffs must challenge "specific procurements or proposed procurements for which they are an interested party," not hypothetical future violations. Gov't's Reply at 11 (internal quotations and citation omitted). Emphasizing its argument the protests are now moot, the government quotes the following statement attributed to plaintiffs' counsel published in a Law360 article on 25 February 2025:

> We are asking the court to extend the logic and jurisdiction of the Federal Circuit in Boeing to bid protests, which is a sister-provision to the CDA provision under the Tucker Act . . . . At this point, the dispute is no longer over PLAs. We've already won that battle and the PLAs have been removed. Now, it is a dispute about the Court of Federal Claims['] jurisdiction to invalidate a federal regulation.

*See* Gov't's Reply, App. at 176–77 (25 Feb. 2025 Law360 Article), ECF No. 116-1. Under 28 U.S.C. § 1491(b), the government argues "this Court's authority to grant injunctive relief is limited to procurements and proposed procurements in which a plaintiff is an actual or prospective offeror with a direct economic interest in the award or failure to award a contract." Gov't's Reply at 11–12 (citations omitted). Although the government acknowledges the Court "may determine whether an agency has violated a statute by applying an executive order or regulation to a particular procurement . . . in which a plaintiff is an interested party," the government argues the Court "may not grant injunctive relief that enjoins the enforcement of an executive order or regulation in all current and future procurements regardless of whether a plaintiff has demonstrated that it is an interested party in those procurements." *Id.* at 12. Arguing "[e]njoining EO 14063 and its implementing regulations is unnecessary and improper to remedy any cognizable injury under 28 U.S.C. § 1491(b)," the government concludes "[n]othing in *Boeing* suggests that this Court can enjoin the enforcement of a regulation in procurements that do not involve the plaintiffs and are not before the Court," and as "the only remaining relief that the non-HPCC plaintiffs seek exceeds this Court's authority and is otherwise improper, their protests must be dismissed as moot." *See id.* at 15.

Finally, addressing HPCC's request for injunctive relief, the government argues HPCC merely speculates the Army Corps or NAVFAC could reinstate the PLA requirements, which "is not sufficient to keep HPCC's case live" given the solicitations have been amended or cancelled. *See id.* Quoting Federal Circuit authority, the government argues "plaintiff[s] must show a likelihood of success on the merits" to prevail, but "because the only relief that HPCC is seeking now is no longer necessary or proper, its protests are moot." *Id.* (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004)).

## V.    Applicable Law

The Court outlines the applicable law for mootness of bid protests and then the requirements for a permanent injunction.

### A.  Motion to Dismiss Based on Mootness in a Bid Protest

The Tucker Act grants the Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Specifically, "the Federal Circuit has held that 'the operative phrase in connection with is very sweeping in scope.'" *Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433, 439–40 (2019) (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999)) (cleaned up). Though the Court's bid protest jurisdiction is broad, it nevertheless "is exclusively concerned with procurement solicitations and contracts." *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010).

Importantly, "mootness . . . is a threshold jurisdictional issue." *Myers Investigative and Sec'y Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (2002); *see Gulley v. United States*, 150 Fed. Cl. 405, 413 (2020) ("[M]ootness of a case is properly the subject of an RCFC 12(b)(1) motion." (quoting *CBY Design Builders v. United States*, 105 Fed. Cl. 303, 328 (2012))). "When, during the course of litigation, it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue, the case should generally be dismissed." *Chapman L. Firm Co. v. Greenleaf Const. Co.*, 490 F.3d 934, 939 (Fed. Cir. 2007). In the context of a bid protest, it is well-established cancellation of the solicitation at issue moots a bid protest. *See, e.g.*, *Madison Servs., Inc. v. United States*, 90 Fed. Cl. 673, 680 (2010); *CW Gov't Travel, Inc. v. United States*, 46 Fed. Cl. 554, 558–59 (2000); *CCL Serv. Corp. v. United States*, 43 Fed. Cl. 680, 689–90 (1999). However, "the Supreme Court has recognized an exception to this rule" may apply "when the defendant voluntarily ceases the challenged practice," but, "the voluntary cessation exception may be refuted when there clearly is no 'reasonable expectation' that the alleged violation will recur and 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Chapman*, 490 F.3d at 939–40 (quoting *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979)).

### B.  Permanent Injunction

When deciding whether a permanent injunction is warranted, a court specifically considers:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA*, 389 F.3d at 1228–29 (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546, n.12 (1987)).  If the Court awards injunctive relief, it may fashion its own remedy to fit the contours of the decision.  *See Turner Constr. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011) (explaining "the Court of Federal Claims has broad equitable powers to fashion an appropriate remedy").

## VI.    Whether the Seven Consolidated Protests Are Moot

At oral argument, the parties agreed mootness is a threshold jurisdictional issue the Court must address from the outset.  *See* Tr. at 114:20–24 ("THE COURT:  Under the Fed[eral] Circuit and Supreme Court precedent, mootness is a threshold jurisdictional issue that the Court would have to address first?  . . .  [PLAINTIFFS]:  I agree."), 125:10–14 ("[GOVERNMENT]:  [A]bout mootness being the threshold issue, I think that's correct in that you address mootness first."); *see also Myers Investigative and Sec'y Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (2002) ("[M]ootness . . . is a threshold jurisdictional issue.").  In addressing the mootness arguments, the Court first compares plaintiffs' requested relief in each complaint with plaintiffs' present Motion for Permanent Injunction.  Second, the Court reviews the relief granted to plaintiffs by the 19 January 2025 decision and the agencies' subsequent corrective action.  Third, the Court addresses the parties' arguments related to the cancelation and amendment of the solicitations taken by the agencies to remove the PLA requirements and what requested relief, if any, from plaintiffs' complaints remains.  Finally, the Court addresses plaintiffs' requested relief for future PLA implementation in the solicitations at issue and future procurements.

### A.    Comparison of Consolidated Plaintiffs' Complaints and the Relief Requested in Plaintiffs' Motions for Permanent Injunction

The Court turns first to the requested relief in plaintiff's original protest complaints.  Beginning with MVL's Complaint, MVL alleges "[a]bsent an injunction," it would "be irreparably harmed because MVL w[ould] be subject to a Solicitation that violates procurement law by imposing unlawful and statutorily unauthorized socioeconomic set asides that violate federal law and severely prejudices MVL's ability to rely on its open-market competitive experience to propose its most competitive pricing and work terms in response to the Solicitation."  *See* MVL's Compl. at 18, ECF No. 12.  Similarly, ECC, JCCBG2, and Harper alleged identical harm in their respective complaints.  *Compare id.*, *with* ECC's Compl. at 22, ECF No. 47 ("Absent an injunction, ECC w[ould] be irreparably harmed because ECC w[ould] be subject to a Solicitation that violates procurement law."), JCCBG2's Compl. at 23 (same for JCCBG2), ECF No. 49, *and* Compl. at 18, *Harper Constr. Co., Inc. v. United States*, No.

24-1398 (Fed. Cl. Sept. 17, 2024) (same for Harper), ECF No. 7.  In each of these four protests, the consolidated plaintiffs urged the Court to:  (1) "[i]ssue a temporary restraining order, preliminary injunction, and permanent injunction issued on an expedited basis requiring the Agency to stay the Procurement process for the Solicitation pending the outcome of this Protest;" (2) "[i]issue a declaratory judgement that the Agency's inclusion in the Solicitation of . . . the PLA Requirements is arbitrary, capricious, or otherwise an abuse of discretion;" and (3) "[i]ssue a permanent injunction and order that the Agency remove and/or void the PLA Requirements from the Solicitation[.]"  *Compare* MVL's Compl. at 19, *with* ECC's Compl. at 23, JCCBG2's Compl. at 25, *and* Compl. at 19–20, *Harper*, No. 24-1398 (Fed. Cl. Sept. 17, 2024), ECF No. 7.

Likewise, HPCC's Complaint asked the Court to:  (1) "[e]nter a temporary restraining order and a preliminary injunction enjoining GSA from awarding a contract under [the] solicitation [] during the pendency of this protest;" (2) "[d]eclare that GSA's requirement that all offerors and the eventual awardee under this Solicitation enter into a PLA is an illegal restriction on full and open competition and is arbitrary, capricious, and an abuse of discretion;" (3) [p]ermanently enjoin GSA from implementing, incorporating, or enforcing any requirement that an offeror or awardee enter into a PLA;" and (4) "[d]irect GSA to reissue the Solicitation in accordance with law and GSA's actual requirements[.]"  HPCC's Compl. at 10–11, ECF No. 52. HPCC's two other protests—one regarding NAVFAC's solicitation for the construction of an engineering test facility at Cape Canaveral and the other involving the Army Corps' solicitation for the construction of a consolidated communications facility in Florida—requested identical relief.  *See* HPCC's Compl. at 11, ECF No. 45; *see also* Compl. at 12, *Hensel Phelps Construction Co. v. United States*, No. 24-1077 (Fed. Cl. July 22, 2024), ECF No. 17.

After prevailing on the merits in January, MVL, ECC, JCCBG2, and Harper now "request the Court to issue a permanent injunction ordering the [g]overnment to rescind" EO 14063 and the implementing FAR regulations, and "take other action as this Court finds appropriate to implement its January 19, 2025 Opinion and Order."  *See* Pls.' Mot. for PI at 9. HPCC similarly "requests that the Court grant permanent injunctive relief to remedy the government's violation of CICA through the imposition of the PLA mandate, including permanently prohibiting the government from imposing any PLA requirement in the solicitations that HPCC has protested."  HPCC's Resp. at 9.  At oral argument, plaintiffs explained they seek an injunction to rescind EO 14063 and implementing FAR regulations as to both the cancelled and amended solicitations.  *See* Tr. at 14:19–15:12 ("[PLAINTIFFS:]  Plaintiffs are seeking [] an injunction that would rescind the FAR rule and Biden executive order . . . .  THE COURT:  But what would that do for the cancelled solicitations?  [PLAINTIFFS]:  It would prevent a new solicitation on the same project from being permitted to rely on the Biden [EO] and the FAR [implementing] requirements related to a mandatory PLA from being places in these new solicitations on the same project. . . .  THE COURT:  And for the three amended solicitations, what are [p]laintiffs requesting?  [PLAINTIFFS]:  On those particular projects, we are also requesting . . . an injunction be issued relative to those solicitations as well . . . [t]o remove the FAR rule and the Biden Executive Order 14063.").

**B. Consolidated Plaintiffs' Requested Relief Granted by the Court's 19 January 2025 Decision and the Agencies' Subsequent Corrective Action**

On 19 January 2025, after determining plaintiffs "succeeded on the merits of their case," the Court granted the seven consolidated plaintiffs' respective MJARs. *See MVL USA*, 174 Fed. Cl. at 474. The Court further determined it "need[ed] not analyze the other [injunctive relief] factors as the parties agree[d] the procurements in this case [were] still ongoing and the government's agreement that each individual agency should be afforded an opportunity to review their solicitations and reconsider the PLA determinations." *Id.* Accordingly, the Court ruled the agencies should "be afforded a short period of time to reassess their PLA decision on an individual basis." *Id.*

Since the Court's 19 January 2025 decision, the agencies have taken corrective action in each of the twelve consolidated protests resulting in: (1) four solicitations being cancelled with the solicitations being either resolicited or planned to be resolicited without a PLA requirement; (2) three solicitations being amended to remove the PLA requirement; and (3) five protests pertaining to separate solicitations being voluntarily dismissed. *See* Tr. at 11:5–13 ("THE COURT: And as a general matter, out of the 12 directly related protests with PLA requirements, the five stayed cases have been voluntarily dismissed, four of the solicitations have been canceled, and the remaining three solicitations have been amended to remove the PLA requirements. Is that a correct total? [GOVERNMENT]: Correct, . . . within this case . . . four have been canceled, three have been amended.").

Specifically, on 14 February 2025, the Army Corps and GSA canceled four solicitations. First, the Army Corps canceled the solicitation—protested by MVL—for a consolidated rigging facility at Joint Base Lewis-McChord in Washington. *See* Gov't's MTD, App. at 5–6 (14 Feb. 2025 Amendment Cancelling Army Corps Solicitation). As the Army Corps noted, the "[g]overnment intends to revise the requirements and resolicit at a future date." *Id.* at 5. Second, the Army Corps canceled the solicitation—protested by ECC—for the construction of a Signal School facility at Fort Eisenhower. *See Id.* at 7–8 (14 Feb. 2025 Amendment Cancelling Army Corps Solicitation). The Army Corps noted this action was taken to ensure "the removal of the PLA requirement consistent with the ruling of the Court of Federal Claims and in accordance with the Class Deviation – Waiver of Project Labor Agreement Requirements." *Id.* at 7. Third, the Army Corps cancelled the solicitation—protested by JCCBG2—for the construction of the Department of Agriculture's Agriculture Research Service in Auburn, Alabama. *See id.* at 9. Fourth, GSA canceled the solicitation—protested by HPCC—for a Land of Port of Entry at the Bridge of the Americas in El Paso, Texas. *See id.* at 12. In the Notice of Cancellation, GSA explained it "will be conducting market research to assess the specific needs of this project related to the PLA requirement and anticipates posting a new solicitation in upcoming months." *Id.* At oral argument, the government explained the GSA solicitation was canceled "in response to this Court's decision," and GSA is "working on a milestone schedule and a sources sought notice for the new solicitation . . . [and] presently has no intention of including a PLA requirement in the next solicitation." *See* Tr. at 26:25–27:11. The government further confirmed GSA could no longer amend this cancelled Land Port of Entry solicitation. *See* Tr. at 11:1–4 ("[THE COURT:] [G]iven that GSA formally canceled the solicitation that HPCC protested, GSA could no longer amend the solicitation, correct? [GOVERNMENT]: Correct."). Additionally, the government noted the GSA class exception, which is still in effect, would apply to the new solicitation. *See* Tr. at 26:7–16 ("[GOVERNMENT:] At this time, we have the class

exception in place for Land Port of Entry contracts.  So that . . . would apply to the new solicitation.").

As to the three solicitations amended to remove the PLA requirement, on 11 February 2025, NAVFAC amended the solicitation—protested by HPCC—for the construction of an engineering test facility at Cape Canaveral Space Force Station in Florida.  *See* Gov't's MTD, App. at 23–24 (11 Feb. 2025 Amendment 1 to NAVFAC Solicitation No. N6945024R0065). NAVFAC noted the purpose of the amendment was to "[r]emove the project Labor Agreement [] requirement in its entirety from this procurement in accordance with Class Deviation" and deleted the section related to PLAs from the solicitation.  *See id.* at 24.  On 19 February 2025, the Army Corps also amended its solicitation—protested by Harper—for the construction of a KC-46 two-bay maintenance/fuel cell hangar at March Air Force Reserve Base in California. *See id.* at 45–55 (19 Feb. 2025 Amendment 3 to Army Corps Solicitation No. W912QR24R0034).  The amendment changed the evaluation criteria by removing all sections requiring PLAs.  *See id.* at 45 ("Project Labor Agreement has been removed." (emphasis omitted)).  On 20 February 2025, the Army Corps amended the solicitation—protested by HPCC—for the construction of a consolidated communications facility at Patrick Space Force Base in Florida.  *See id.* at 94 (20 Feb. 2025 Amendment 4 to Army Corps Solicitation No. W9127823R0115).  The Army Corps removed all sections containing a PLA requirement.  *See id.* at 94–165 (striking through and removing all sections requiring a PLA).

### C.  Whether the Agencies' Corrective Action Moots Plaintiffs' Originally Requested Relief

The Court now turns to the parties' mootness arguments related to the agencies' cancelation and amendments of the solicitations to remove the PLA requirements.  Specifically, the Court analyzes what requested relief, if any, from plaintiffs' bid protest complaints remain. The Court first examines the requested relief in MVL, ECC, and JCCBG2's complaints and whether the agencies' corrective action moots plaintiffs' protests when the Army Corps cancelled the three solicitations.  The Court then addresses Harper's requested relief and whether the Army Corps' amendment of the solicitation to remove the PLA requirements moots Harper's protest.  Finally, the Court examines HPCC's requested relief and whether the corrective action taken by the Army Corps, NAVFAC, and GSA in HPPC's challenges moots the three protests.

### 1.  Whether the Army Corps' Cancellation of the Solicitations in MVL, ECC, and JCCBG2's Cases Moots the Three Protests

The Court first considers whether plaintiffs MVL, ECC, and JCCBG2 have identified any requested relief left for the Court to address from their protest complaints.  As an initial matter, plaintiffs MVL, ECC, and JCCBG2 sought identical relief in their respective complaints.  *See supra*, Section VI.A.  Accordingly, the Court addresses the availability of relief to MVL, ECC, and JCCBG2 collectively.

Turning first to plaintiffs' requested relief in their complaints, MVL, ECC, and JCCBG2 each alleged:  "Absent an injunction, [plaintiffs] w[ould] be irreparably harmed because [plaintiffs] w[ould] be subject to [solicitations] that violate[] procurement law by imposing

unlawful and statutorily unauthorized socioeconomic set asides that violate federal law and severely prejudic[e] [plaintiffs'] ability to rely on its open-market competitive experience to propose its most competitive pricing and work terms in response to the [s]olicitation[s]." MVL's Compl. at 18, ECF No. 12; ECC's Compl. at 22, ECF No. 47; JCCBG2's Compl. at 23, ECF No. 49. When comparing plaintiffs' Motion for Permanent Injunction with their complaints, at oral argument, plaintiffs acknowledged their first point of requested relief—"a temporary restraining order, preliminary injunction, and permanent injunction issued on an expedited basis requiring the Agency to stay the Procurement process for the Solicitation pending the outcome of this Protest," MVL's Compl. at 19, ECF No. 12; ECC's Compl. at 23, ECF No. 47; JCCBG2's Compl. at 25, ECF No. 49—is now moot. *See* Tr. at 116:19–23 ("THE COURT:  Just looking at the original complaint, [plaintiffs'] first point of requested relief enjoining the agencies to stay the procurement process, that's moot now, right?  [PLAINTIFFS]:  Yes."). The Court next turns to plaintiffs' second point of requested relief—"a declaratory judg[]ment that the Agency's inclusion in the Solicitation of . . . the PLA Requirements is arbitrary, capricious, or otherwise an abuse of discretion." MVL's Compl. at 19, ECF No. 12; ECC's Compl. at 23, ECF No. 47; JCCBG2's Compl. at 25, ECF No. 49. At oral argument, plaintiffs agreed their second point of requested relief was rendered moot by the 19 January 2025 decision. *See* Tr. at 116:24–117:3 ("THE COURT:  And the second point of relief, given that the Court determined that the PLA requirements for the solicitation were arbitrary and capricious, that's moot as well, right?  [PLAINTIFFS]:  I believe the Court did rule that."). Finally, as to the third item of plaintiffs' requested relief—"a permanent injunction and order that the Agency remove and/or void the PLA Requirements from the Solicitation," MVL's Compl. at 19, ECF No. 12; ECC's Compl. at 23, ECF No. 47; JCCBG2's Compl. at 25, ECF No. 49—plaintiffs initially argued the Court could still grant this relief, but ultimately confirmed this point is also moot given the agencies have removed the PLA requirements from each solicitation. *See* Tr. at 117:4–14 ("THE COURT:  And then ordering the agency to remove the PLA requirements, you got that, so that's moot, right?  The third point of requested relief.  [PLAINTIFFS]:  I think we're still asking the Court to remove the PLA and the executive order . . . .  So I would say that's not moot.  THE COURT:  So the third point is 'the agency remove the PLA requirements from the solicitation.'  [PLAINTIFFS]:  Yes, correct.  That's moot.  THE COURT:  So you got that?  [PLAINTIFFS]:  Yes."). While discussing the complaint language, plaintiffs did not identify any additional points of requested relief from their complaints remaining for the Court to address. *See* Tr. at 116:19–117:14.

As MVL, ECC, and JCCBG2 did not identify any relief requested in their complaints left for the Court to resolve, the Court turns to plaintiffs' argument that the Army Corps' cancellation of the MVL, ECC, and JCCBG2 solicitations is not sufficiently permanent to render the protests moot. Foremost, plaintiffs agreed at oral argument when a solicitation is canceled and a new solicitation is issued, all actions related to the first solicitations become moot.[4] *See* Tr. at 115:23–116:3 ("[THE COURT:]  [T]he government cites multiple . . . cases that say, 'When a

---

[4] Within the bid protest context, cancellation of the solicitation generally moots a bid protest of that solicitation. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1335 (Fed. Cir. 2004) ("We agree with the Court of Federal Claims that such alleged violations were rendered moot by the order of a new solicitation [by the agency]."); *Madison*, 90 Fed. Cl. 673 at 680 ("[A]s to the mootness impediment, if the cancellation is ultimately upheld by the court, it would obviously render plaintiff's original protest (counts I–III) moot."); *CW*, 46 Fed. Cl. 554, 558 (Fed. Cl. 2000) ("This court previously has dismissed a bid protest claim for mootness due to cancellation of the award." (citing *CCL*, 43 Fed. Cl. at 689–90)).

solicitation is canceled, and a new solicitation is ordered, all actions relating to that first solicitation are moot.' [PLAINTIFFS]: I would generally agree with that[.]"). Plaintiffs further noted an exception to this rule may arise when bad faith is present but promptly clarified plaintiffs do not allege bad faith is present here.[5] *See* Tr. at 116:4–11 ("[PLAINTIFFS:] [B]ad faith, I believe, is the basis where the government cancels a solicitation and the courts have allowed it to be litigated on the basis of the impropriety of the cancellation. THE COURT: Which cases are those? [PLAINTIFFS]: I don't have them. . . . I'm not suggesting that we have bad faith here[.]"); 120:23–24 ("[PLAINTIFFS:] I'm not suggesting that they are over here scheming or anything."). Still, plaintiffs could not offer any other examples absent bad faith for exceptions to the general rule that cancellation moots a protest. *See* Tr. at 116:12–18 ("THE COURT: So is there any case, then, that would support, other than bad faith, that when a solicitation is canceled, the actions regarding the solicitation are moot[?] [PLAINTIFFS]: I don't know. We would have to look more closely. I can't give you a well-informed answer on that.").

Plaintiffs, nonetheless, argue the cancellations here are malleable, urging the Court to view the cancellations as responsive to impermanent class deviations and find the protests are not moot. *See* Tr. at 7:14–16 ("[PLAINTIFFS:] [T]here's nothing in the law that would prohibit either DoD or GSA from rescinding their . . . class deviation and class exception."); 25:1–5 ("[PLAINTIFFS:] This is a highly malleable attempt at corrective action that doesn't provide the finality that is required to . . . declare a case is moot."); *see also* Tr. at 74:22–75:1 ("[PLAINTIFFS:] I think the testimony here today . . . has established that the likelihood or expectation that the violation will recur is not remedied by the discretionary issuance of the deviations and exceptions."). According to plaintiffs, MVL, ECC, and JCCBG2's protests are not moot because the government has "failed to demonstrate that there is no reasonable expectation that CICA violations will recur." *See* Pls.' Reply at 7. In considering whether cancellation of the three solicitations moots MVL, ECC, and JCCBG2's protests, plaintiffs suggest "the salient question is whether an agency's corrective action has completely and irrevocably eradicated the effects of the alleged violation of law." *Id.* (cleaned up). Indeed, "the Supreme Court has recognized an exception" may apply "when the [government] voluntarily ceases the challenged practice," but as plaintiffs point out, "the voluntary cessation exception may be refuted when there clearly is no 'reasonable expectation' that the alleged violation will recur and 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Chapman*, 490 F.3d at 939–40 (quoting *Davis*, 440 U.S. 625 at 631). After the government confirmed the DoD class deviation and GSA class exception remain in place, however, plaintiffs could not articulate a factual basis to argue the DoD class deviation or GSA class exception has changed or will imminently change. *See* Tr. at 6:21–7:21 ("[THE COURT:] [A]re both the DoD and GSA class deviations still in place? [GOVERNMENT]: Yes . . . . [THE COURT:] Do [p]laintiffs have any factual basis upon which that they make the argument either or both deviations have changed or will imminently change at this point? [PLAINTIFFS]: Not on those two specifically."). Instead, plaintiffs offered examples of other agencies' oscillating stances on PLA requirements to support their "reasonable expectation" arguments;

---

[5] The Court notes "any analysis of a question of governmental bad faith must begin with the presumption that public officials act conscientiously in the discharge of their duties and it requires well-nigh irrefragable proof to induce the court to abandon the presumption of good faith dealing." *CCL*, 43 Fed. Cl. at 688 (quoting *Kalvar Corp. v. United States*, 211 Ct. Cl. 192, 198 (Ct. Cl. 1977)) (cleaned up).

but ultimately recognized scenarios involving agencies outside of these consolidated cases are not in the record before the Court, and the Court cannot rely on them to support plaintiffs' argument. *See* Tr. at 109:23–111:6 ("THE COURT: So you agree, then, . . . the VA and FBI hypothetical examples cannot be evidence in order to support an injunction in this case? [PLAINTIFFS:] I . . . don't believe that the Court necessarily needs them in the record evidence to rule. . . . THE COURT: The Court can't keep them in the evidence to support an injunction here. [PLAINTIFFS:] Right[.]"); *see also* Tr. at 81:14–82:10 ("[THE COURT:] [W]as there a motion to supplement the administrative record, then? [PLAINTIFFS:] There has not been. . . . [THE COURT:] [W]hat you're describing, there's no evidence in the record that I can rely on? [PLAINTIFFS:] That's correct."); Pls.' Reply at 10–12 (relying on the VA and FBI examples to argue "[a]bsent clear direction, it is also *possible* that the [g]overnment could likewise rescind the [DoD] class FAR deviation" (emphasis added)). Without record evidence, plaintiffs' mere speculation is insufficient to demonstrate a reasonable expectation the Army Corps will re-implement the PLA requirements in these solicitations. *See Chapman*, 490 F.3d at 939–40 ("[T]he voluntary cessation exception may be refuted when there clearly is no 'reasonable expectation' that the alleged violation will recur and 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" (quoting *Davis*, 440 U.S. at 631)).

Plaintiffs still urge the Court to find the cancellations here are impermanent solutions to "the risk of recurring harm" in MVL, ECC, JCCBG2's protests and future procurements. *See* Tr. at 75:8–16 ("[PLAINTIFFS:] [T]he voluntary cessation of illegal conduct does not make a case moot . . . . I think this is an instance of where not only is there the risk of recurring harm, maybe *not* in the context of these specific 12 solicitations, but possibly in the context of some of the 12 solicitations, but more broadly . . . I think this issue is just going to keep coming back to the court." (emphasis added)). On this record, plaintiffs do not explain how the alleged "risk of recurring harm"—which they acknowledge *may not* exist "in the context of these specific . . . solicitations"—supports a finding of a *reasonable expectation* the CICA violations will recur in these three cancelled solicitations. *See* Tr. at 75:8–16. Further, plaintiffs focus their arguments on the alleged malleability of the DoD class deviation, but plaintiffs agreed even if the class deviation was not in place, the 19 January 2025 decision "still stands," and the agencies would still be subject to the Court's decision regarding these specific solicitations. *See* Tr. at 119:19–25. By claiming future harm beyond the context of these protests—without providing evidence on this record related to these *specific* protests—plaintiffs cannot sustain their opposition to mootness by merely arguing "this issue is going to keep coming back to the court." *See* Tr. at 75:8–16. As discussed *supra* Section VI.B, plaintiffs received the relief requested in their complaints when the Court found the agencies' PLA requirements arbitrary and capricious, and the agencies subsequently removed the PLA requirements from each solicitation. Without more, MVL, ECC, and JCCBG2 have not demonstrated a factual basis on this record supporting a "*reasonable expectation*" the Army Corps will re-implement the PLA requirements in the three already-cancelled solicitations; nor have they shown the cancellation of the solicitations did not "completely and irrevocably eradicate[] the effects of the [CICA] violation." *See Chapman*, 490 F.3d at 939–40 (quoting *Davis*, 440 U.S. at 631).

### 2. Whether the Army Corps' Amendment to the Solicitation Moots Harper's Protest

- 23 -

The Court next addresses whether Harper's protest related to the Army Corps' construction of a fuel cell hangar at March Air Force Reserve Base was rendered moot when the agency amended the solicitation to remove the PLA requirements.  In its Complaint, Harper sought identical relief as consolidated plaintiffs MVL, ECC, and JCCBG2.  *See supra* Section VI.A.  Turning to Harper's first point of requested relief—"a temporary restraining order, preliminary injunction, and permanent injunction issued on an expedited basis requiring the Agency to stay the Procurement process for the Solicitation pending the outcome of this Protest," Compl. at 19, *Harper*, No. 24-1398 (Fed. Cl. Sept. 17, 2024), ECF No. 7—plaintiffs agreed the requested relief is now moot.  *See* Tr. at 116:19–23.  The Court next turns to Harper's second point of requested relief—"a declaratory judg[]ment that the Agency's inclusion in the Solicitation of . . . the PLA Requirements violates CICA and is arbitrary, capricious, or otherwise an abuse of discretion."  Compl. at 19, *Harper*, No. 24-1398 (Fed. Cl. Sept. 17, 2024), ECF No. 7.  At oral argument, plaintiffs confirmed this point was rendered moot by the 19 January 2025 decision.  *See* Tr. at 116:24–117:3.  Lastly, as to the third item of plaintiffs' requested relief—"[i]ssue a permanent injunction and order that the Agency remove and/or void the PLA Requirements from the Solicitation," Compl. at 20, *Harper*, No. 24-1398 (Fed. Cl. Sept. 17, 2024), ECF No. 7—plaintiffs ultimately agreed this point is also moot.  *See* Tr. at 117:10–14.  While discussing mootness of plaintiffs' complaint language, plaintiffs did not identify any additional points of requested relief from Harper's Complaint remaining for the Court to address. *See* Tr. at 116:19–117:14.

Although plaintiffs' mootness briefing did not specifically address the Army Corps' corrective action amending the solicitation in Harper's protest, plaintiffs generally argue their protests are not moot because the government has "failed to demonstrate that there is no reasonable expectation that CICA violations will recur."  *See* Pls.' Reply at 7.  Plaintiffs rely on examples involving other agencies separate from these consolidated cases as evidence the Army Corps *might* re-implement the PLA requirements, though as discussed *supra* Section VI.C.1, plaintiffs confirmed there is no such evidence related to the Army Corps in the record before the Court, and the Court cannot rely on these speculations to support plaintiffs' argument.  *See* Tr. at 109:23–111:6; *see also* Tr. at 81:14–82:10.  As discussed *supra* Sections VI.B and VI.C.1, plaintiffs achieved the relief requested in their complaints when the Court found the agencies' inclusion of the PLA requirements arbitrary and capricious, and the agencies subsequently removed the PLA requirements from each solicitation—including the Army Corps' removal of the PLA requirements from the fuel cell hanger solicitation.  Further, plaintiffs' arguments fail to address the reality that even if the class deviation did not apply to this solicitation, the Army Corps is still subject to the 19 January 2025 decision regarding this specific fuel cell hangar solicitation, especially considering plaintiffs agreed the Court's decision "still stands."  *See* Tr. at 119:19–25.  Without more, Harper's speculative arguments fall short of demonstrating a "reasonable expectation" the CICA violation will recur *and* fail to offer factual support demonstrating the Army Corps' amendment of the solicitation has not "completely and irrevocably eradicated the effects" of the CICA violation.  *See Chapman*, 490 F.3d at 939–40 (quoting *Davis*, 440 U.S. at 631).

Plaintiffs again repeat the same claim, without any credible evidence, arguing they may rebut the voluntary cessation exception by demonstrating there is a "reasonable expectation" the CICA violation will recur, and the government has not "completely and irrevocably eradicated

the effects" of the CICA violations. *See* Pls.' Reply at 7. In doing so, plaintiffs cite the same examples involving other agencies, which are separate from these consolidated cases and not in the record before the Court. *See* Tr. at 109:23–111:6; *see also* Tr. at 81:14–82:10. This alone cannot be a factual basis to support a "reasonable expectation" the government will re-implement the PLA requirements, especially given there is no risk of future harm of re-implementation as the 19 January 2025 decision "still stands" and continues to apply to the Army Corps' fuel cell hunger solicitation. *See* Tr. at 119:19–25. Indeed, the government represented at oral argument the government "couldn't go back," and "[t]here is no indication that the government plans to reinstate the[ solicitations at issue]," and instead, plans to follow the 19 January 2025 decision, thereby eliminating any *reasonable expectation* of future harm to plaintiffs. *See* Tr. at 41:19–23, 76:25–77:11; *see also* Tr. at 30:4–9 ("[GOVERNMENT:] [I]t would make very little sense to simply issue a new solicitation with a PLA requirement without a strong justification for doing so. . . . And we have no reason to believe that that's going to happen."), 35:9–12 ("[THE COURT:] I heard you say . . . the January decision covers the 12 that are here, at least for now? [PLAINTIFFS]: Yes, Your Honor."). Considering the government's representations and plaintiffs' failure to cite any evidence in the record indicating a "reasonable expectation" the Army Corps will re-implement the PLA requirements, *and* Harper has not offered factual support to demonstrate the cancellation of the solicitation did not "completely and irrevocably eradicate[] the effects of the [CICA] violation." *See Chapman*, 490 F.3d at 939–40 (quoting *Davis*, 440 U.S. at 631).

At oral argument, plaintiffs first argued the four cancelled solicitations are most susceptible to re-implementation of the PLA requirements, thereby a "reasonable expectation" exists the Army Corps will re-implement a PLA requirement in the Harper protest. *See* Tr. at 78:11–20 ("[PLAINTIFFS:] [I]f you wanted to take a more restrictive view, and the logic for that would be [in] the other three, . . . either new [requests for proposals ('RFP')] have been issued or amended. In one case, the existing RFP was amended . . . . [W]e don't know yet whether those RFPs that come back out will continue to include the FAR 22.5 factors."). Plaintiffs, however, acknowledged the RFPs have already issued without PLA requirements for the three amended solicitations consistent with the 19 January 2025 decision. *See* Tr. at 78:11–20. Such inconsistency undercuts plaintiffs' argument given plaintiffs recognize the removal of the PLAs has been more formalized in the solicitations with the already-issued RFPs as opposed to the cancelled solicitations where the RFPs have not yet issued. *See* Tr. at 78:11–20. Next, plaintiffs argued the cases here are not moot because the PLA requirements may present an ongoing issue for the Court in future protests. *See* Tr. at 75:8–16. At the same time, however, plaintiffs agreed possible *future* harm is beyond the context of these specific protests and failed to explain how the ongoing issue presents a "reasonable expectation" the Army Corps will re-implement the PLA requirements in this amended solicitation. *See* Tr. at 75:8–16; *see also* Tr. at 109:23–111:13. Given plaintiffs' inability to cite any credible evidence in support of its position as discussed *supra*, these arguments fail to indicate a "*reasonable expectation*" the Army Corps will re-implement the PLA requirements, rending Harper's protest moot. *See Chapman*, 490 F.3d at 939–40 ("[T]he voluntary cessation exception may be refuted when there clearly is no 'reasonable expectation' that the alleged violation will recur and 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" (quoting *Davis*, 440 U.S. at 631)).

### 3. Whether the Army Corps, NAVFAC, and GSA's Corrective Action in the Three HPCC Cases Moots the Protests

HPCC urges the Court to find its protests are not moot, arguing the corrective action taken by the Army Corps, GSA, and NAVFAC to remove the PLA requirements by amending or cancelling the solicitations in the HPCC cases do not render those protests moot. The Court first addresses whether HPCC has identified any requested relief from its three protest complaints remaining for the Court to address. The Court then examines HPCC's mootness arguments related to the corrective action taken by the Army Corps and NAVFAC to remove the PLA requirements by amending the solicitations in two of HPCC's protests. Finally, the Court addresses HPCC's mootness arguments related to GSA's cancellation of the Bridge of Americas Land Port of Entry following the issuance of GSA's class exception.

In HPCC's three protest complaints, HPCC requested the Court "[e]nter a temporary restraining order and a preliminary injunction enjoining [the agencies] from awarding a contract under [the solicitation] during the pendency of this protest[.]" HPCC's Compl. at 10, ECF No. 52; HPCC's Compl. at 11, ECF No. 45; Compl. at 12, *Hensel*, No. 24-1077 (Fed. Cl. July 22, 2024), ECF No. 17. At oral argument, plaintiffs confirmed their request to enjoin the agencies to stay the procurement process is now "moot." *See* Tr. at 116:19–23. As to HPCC's second point of requested relief—asking the Court "[d]eclare [the agencies'] requirement that all offerors and the eventual awardee under this Solicitation enter into a PLA is an illegal restriction on full and open competition and is arbitrary, capricious, and an abuse of discretion"—the Court granted HPCC's MJARs in the 19 January 2025 decision. *See supra* Section I.A. Accordingly, plaintiffs recognized at oral argument their second point of requested relief is moot. *See* Tr. at 116:24–117:3. HPCC's third point of requested relief—seeking to "[p]ermanently enjoin [the agencies] from implementing, incorporating, or enforcing any requirement that an offeror or awardee enter into a PLA"—closely tracks with HPCC's present request for an injunction "permanently prohibiting the government from imposing any PLA requirement in the solicitations that HPCC has protested." *Compare* HPCC's Compl. at 11, ECF No. 52, HPCC's Compl. at 11, ECF No. 45, *and* Compl. at 12, *Hensel*, No. 24-1077 (Fed. Cl. July 22, 2024), ECF No. 17, *with* HPCC's Resp. at 10. Similarly, HPCC's three complaints requested the Court "[d]irect [the agencies] to reissue the Solicitation[s] in accordance with law and [the agencies'] actual requirements," consistent with HPCC's present request to "permanently prohibit[] the government from imposing any PLA requirement in the solicitations that PLA has protested." *Compare* HPCC's Compl. at 11, ECF No. 52, HPCC's Compl. at 11, ECF No. 45, *and* Compl. at 12, *Hensel*, No. 24-1077 (Fed. Cl. July 22, 2024), ECF No. 17, *with* HPCC's Resp. at 10. The Court, therefore, addresses these remaining requests from HPCC's complaints together with HPCC's mootness arguments related to its pending request for permanent injunctive relief.

First, the Court examines whether HPCC's protest related to the Army Corps' construction of a consolidated communications facility at Patrick Space Force Base and NAVFAC's construction of an engineering test facility at Cape Canaveral Space Force Station were rendered moot when the agencies amended the solicitations to remove the PLA requirements. Regarding the Army Corps and NAVFAC amendments, HPCC argues "[n]one of the corrective actions . . . provide the Court, [p]laintiffs, or any potential offerors on future projects any certainty that the PLA requirements will not be forced upon contractors in the

future." HPCC's Reply at 3.  Noting "proposals are not due until March 25, 2025," HPCC argues the government *might* re-implement the PLA requirements because "the proposal deadlines have not yet passed." *Id.* (emphasis added).  At oral argument, however, plaintiffs acknowledged the RFPs have since issued for each of the three amended solicitations. *See* Tr. at 78:11–20.  Plaintiffs further suggested the issuance of the RFPs in these amended solicitations indicates the four cancelled solicitations are most susceptible to re-implementation given the RFPs in those cases have not issued yet, undermining HPCC's arguments here regarding the risk of re-implementation in the amended solicitations. *See* Tr. at 78:11–20.  For reasons similar to those discussed *supra* Section IV.C.2, HPCC fails to indicate a "*reasonable expectation*" NAVFAC will re-implement the PLA requirements to rebut the mootness of this protest. *See Chapman*, 490 F.3d at 939–40 (quoting *Davis*, 440 U.S. at 631).

HPCC next argues "[a] class deviation provides almost no certainty that the government will not reverse course" in the two protests related to the Army Corps' construction of a consolidated communications facility and NAVFAC's construction of an engineering test facility. *See* HPCC's Resp. at 3.  Relying on the same VA example utilized by MVL, ECC, JCCBG2, and Harper—HPCC argues "the VA's equivocating" demonstrated "a class deviation can easily be rescinded and an open solicitation amended to insert PLA requirements that had previously been removed." *See id.* at 4.  Plaintiffs, however, agreed the Court cannot consider the VA example as record evidence here as they are not in the record, and no motion to supplement the record had been filed. *See* Tr. at 109:23–111:6; *see also* Tr. at 81:14–82:10.  Indeed, the government represented the government "couldn't go back," and "[t]here is no indication that the government plans to reinstate the[ solicitations at issue]," and instead, plans to follow the 19 January 2025 decision, thereby eliminating any *reasonable expectation* of future harm to plaintiffs. *See* Tr. at 41:19–23, 76:25–77:11; *see also* Tr. at 30:4–9, 35:9–12.  Considering the government's representations and plaintiffs' failure to cite any evidence in the record indicating a "reasonable expectation" of the agencies re-implementing the PLA requirements in these solicitations, HPCC has not demonstrated the amendments fall short of "completely and irrevocably eradicat[ing] the effects of the [CICA] violation." *See Chapman*, 490 F.3d at 939–40 (quoting *Davis*, 440 U.S. at 631).

HPCC nevertheless argues the government has *not* "stated unequivocally that the PLA requirement will *not* be reinstated" in any of the three procurements, and these protests cannot be moot because HPCC lacks "actual certainty that the PLA requirements will not be revived." HPCC's Resp. at 4 (emphasis in original).  Yet, HPCC could offer no example of an agency removing a requirement pursuant to a court order and then later amending the solicitation to reinstate the requirement. *See* Tr. at 110:14–111:13 ("THE COURT:  Do you have any examples of agencies removing a requirement pursuant to a court order and then later amending a solicitation to reinstate the requirement?  [PLAINTIFFS]:  The VA procurement . . . .  THE COURT:  But you already agreed that is not part of this case?  [PLAINTIFFS]:  It is not part of this case. . . .  THE COURT:  So no example of a procurement that was subject to a case in a court order?  [PLAINTIFFS]:  Not in these 12, no.  THE COURT:  Or any other prior example[?]  [PLAINTIFFS]:  Not that I'm aware of."); *see also* Tr. at 81:13–82:10.  Furthermore, plaintiffs acknowledged the 19 January 2025 decision "still stands," and the Army Corps and NAVFAC—like GSA—are still subject to the Court decision regarding these specific solicitations regardless of the DoD class deviation. *See* Tr. at 119:19–25; *see also* Tr. at 30:4–9,

35:9–12, 41:19–23, 76:25–77:11. Although plaintiffs' future harm arguments extend beyond the context of these specific protests, HPCC already achieved the relief requested in its complaint when the Court found as arbitrary and capricious the Army Corps' inclusion of the PLA requirements in the engineering test facility solicitation and the consolidated communications facility solicitation—and the Army Corps has amended both solicitations to remove the PLA requirements, as discussed *supra*. *See* Tr. at 75:8–16. On this record alone, HPCC's speculative arguments fall short of demonstrating a "reasonable expectation" the CICA violation will recur *and* fail to offer factual support demonstrating the Army Corps' amendment of these two solicitations to remove the PLA requirement has not "completely and irrevocably eradicated the effects" of the CICA violation—especially given plaintiffs' recognition that the RFPs have already issued as discussed *supra*. *See Chapman*, 490 F.3d at 939–40 (quoting *Davis*, 440 U.S. at 631).

Moreover, as to GSA's cancellation of the solicitation for the Bridge of the Americas Land Port of Entry project, HPCC does not focus its mootness arguments on the cancellation of the solicitation itself. *See* HPCC's Resp. at 1–5. HPCC instead argues GSA's class exception is neither permanent nor guaranteed, while characterizing the GSA class deviation as "a highly malleable attempt at corrective action that doesn't provide the finality that is required to . . . declare that a case is moot." Tr. at 25:1–5; *see* HPCC's Resp. at 1–2 ("The government's own actions in response to the Court's [decision] show that the government has taken uncoordinated half-measures that provide no certainty to the Court, HPCC, or any other offeror that the PLA requirement will not be again foisted upon offerors in these or other procurements."); *see* Tr. at 23:6–25 ("[PLAINTIFFS:] [T]he GSA class exception doesn't make that issue moot . . . . [W]e're not necessarily challenging the fact that the agency has decided to attempt to correct its error . . . the way that [GSA issued the class exception] is very much open to attack . . . . So there's still a live controversy there and the way GSA did it is the reason there is still a controversy."). Specifically, HPCC claims the government has not "completely and irrevocably eradicated the effects of the alleged violation," HPCC's Resp. at 4 (citations and emphasis omitted), and nothing legally prevents GSA from revising or revoking the class exception, *see* Tr. at 25:6–25 ("[PLAINTIFFS:] And in this case, even the cancellation of that GSA solicitation for the Land Port of Entry, that in itself also doesn't necessarily make this a moot issue. . . . Nobody from GSA, as far as we're aware, has made any declarations under oath . . . GSA has no intention of rescinding or otherwise altering its class exception, other than to say it's highly unlikely. Well, that's not certain and that's not absolute and it's certainly not final. So that's the reason we take issue with the GSA class exception."). When pressed, however, HPCC agreed revocation of a class exception could not be used to amend and insert a PLA requirement into an already-canceled solicitation. *See* Tr. at 10:16–23 ("[THE COURT:] [S]pecifically on HPCC's response brief, . . . there was an argument 'a class deviation can easily be rescinded and an open solicitation amended to insert PLA requirement that had previously been removed.' But this could not happen to the Bridge of the Americas Land Port of Entry protest where GSA actually canceled the solicitation there[?] [PLAINTIFFS]: That would be my understanding, yes."). Although HPCC focuses on the alleged malleability of the GSA class exception, plaintiffs agreed the 19 January 2025 decision "still stands," and GSA would still be subject to the Court's decision regarding this specific solicitation even if the class exception was not in place. *See* Tr. at 119:19–25; *see also* Tr. at 30:4–9, 35:9–12, 41:19–23, 76:25–77:11. HPCC, therefore, needs

more factual basis to support its "reasonable expectation" GSA will re-implement the PLA requirements. *See Chapman*, 490 F.3d at 939–40 (quoting *Davis*, 440 U.S. at 631).

Finally, although HPCC argued GSA's corrective action is "ephemeral," HPCC acknowledged any action taken by GSA to re-implement a PLA requirement post-cancelation would have to be made via a new bid protest separate from these consolidated cases. *See* Tr. at 111:14–20 ("THE COURT:  For HPCC, on page 1 of your response, you argue that the corrective action taken in the GSA protest is ephemeral because the agency appears to assert a continuing right to impose the illegal PLA, but you agree . . . that's still a future procurement decision?  [HPCC]:  Yes."); *see also CW*, 46 Fed. Cl. at 559 ("Should the new solicitation *not* satisfactorily address plaintiff's (or others') concerns, plaintiff (or others) may, of course, challenge the new solicitation.").  The government also clarified the GSA class exception was issued on an urgent basis to address the ongoing need for projects at the nation's border and there is no record support of HPCC's argument that GSA may rescind the class exception. *See* Tr. at 29:11–30:9 ("[GOVERNMENT:]  [T]he [GSA] class exception explains why it was issued in terms of the urgency . . . these projects . . . relat[e] to the border . . . .  [T]he issue here is the urgency of getting these projects filled . . . .  [I]t would make very little sense to simply issue a new solicitation with a PLA requirement without a strong justification for doing so. . . .  And we have no reason to believe that's going to happen.").  Plaintiffs nonetheless could not produce any examples of an agency implementing a class exception only to later revoke the class exception and implement a requirement in contravention of a court order. *See* Tr. at 110:14–111:13; *see also* Tr. at 81:13–82:10.  Plaintiffs ignore the fact that HPCC already achieved the relief requested in its protest complaint when the Court found GSA's inclusion of the PLA requirements in the solicitation arbitrary and capricious, and as discussed *supra*, GSA amended the solicitation to remove the PLA requirements.  When asked at oral argument about the likelihood of future harm, plaintiffs offered no concrete evidence and agreed with the Court "anything could occur in the future." *See* Tr. at 111:14–113:18.  Without more, HPCC has not demonstrated a factual basis on this record supporting a "reasonable expectation" GSA will re-implement the PLA requirements in the already-cancelled solicitation nor demonstrated how the cancellation of the solicitation to remove the PLA requirements—consistent with the Court's decision—did not "completely and irrevocably eradicate[] the effects of the [CICA] violation." *See Chapman*, 490 F.3d at 939–40 (quoting *Davis*, 440 U.S. at 631).

### D.  Consolidated Plaintiffs' Requested Relief Related to Future PLA Implementation in the Seven Remaining Solicitations and Future Procurements

According to plaintiffs, the agencies' corrective action did not resolve plaintiffs' protests because "the government will continue to operate in an improper manner and contractors who are unwilling or unable to enter into an agreement with a labor union for the labor on construction contracts will continue [to be ineligible] for large-scale federal procurements." *See* Tr. at 76:2–7; *see also* Tr. at 120:23–121:6 ("[PLAINTIFFS:]  I'm not suggesting that they are over here scheming or anything, but . . . the government is not currently prohibited by the Court's January 19th [O]rder from trying to find some other way to impose the PLA requirement on these active solicitations.  And that's a real risk.");  116:4–11.  Plaintiffs further argue the corrective action in these cases cannot be viewed as final because the agencies—the Army Corps, NAVFAC, and GSA—are confused regarding the applicability of the 19 January 2025

decision beyond the seven consolidated plaintiffs before the Court, which may harm these plaintiffs and others within the contracting community at large. *See* Tr. at 80:21–82:10 ("[PLAINTIFFS]: Well, several clients have shared emails that they've exchanged with the [Army] Corps, NAVFAC, and GSA, where a dialogue is ongoing about the January decision in this case and agency representatives are stating that they're confused because the executive order is still in effect and the FAR rule is still in effect, and they don't know how to reconcile the January [Order.] THE COURT: Related to these procurements? [PLAINTIFFS:] In one instance, yes, but in others, it's the same plaintiffs in these cases who are dialoguing on both this case in terms of the canceled or amended solicitations[.]"). When pressed, however, plaintiffs clarified there is no such record evidence of alleged agency confusion for the Court to review or consider in its mootness determination. *See* Tr. at 81:13–82:10 ("THE COURT: Well, so if it's related to one of the procurements in this case, was there a motion to supplement the administrative record, then? [PLAINTIFFS:] There has not been . . . . [THE COURT:] [W]hat you're describing, there's no evidence in the record that I can rely on? [PLAINTIFFS:] That's correct."). Without factual support to rebut the voluntary cessation exception, plaintiffs' naked assertion alone is insufficient to overcome mootness. *See Chapman*, 490 F.3d at 939–40 (quoting *Davis*, 440 U.S. at 631); *see also* Tr. at 30:4–9, 35:9–12, 41:19–23, 76:25–77:11.

Plaintiffs next ground their mootness arguments in the potential for *future* harm—to plaintiffs and parties beyond these consolidated cases—because plaintiffs have already achieved their original desired result when the agencies removed the PLA requirements from each solicitation following the Court's decision. *See* Tr. at 55:24–56:14 ("THE COURT: Just to confirm, related to the relief requested for the 12 protests here, the argument is with respect to future harm only, correct? [PLAINTIFFS]: That is correct. It does not relate to the current status of the procurements. As it stands currently, all 12 PLAs have been removed."). HPCC went so far as to argue its Land Port of Entry solicitation is not moot because GSA has "provide[d] no certainty to the Court, HPCC, *or any other offeror* that the PLA requirement will not be again foisted upon offerors in these *or other procurements*." *See* HPPC's Resp. at 2 (emphasis added). These arguments, however, do not appropriately address the availability of relief—to plaintiffs and other parties alike—through *future* bid protests. *See, e.g.,* Tr. at 108:13–18 ("THE COURT: How can contractors affected by the VA's oscillating stance on PLAs, this is related to the VA's issues, constitute an interested party now? . . . [PLAINTIFFS:]: I think an interested party would have to file a bid protest based on a VA procurement[.]"), 109:12–22 ("THE COURT: So . . . in your briefing, you cite examples from the VA and the FBI related to other potential solicitations. [PLAINTIFFS]: Right. THE COURT: You agree that all of those would have to go through their own protests? [PLAINTIFFS]: I agree with that, if the Court doesn't issue an injunction removing the FAR PLA rule and the executive order. Yes, that's how these . . . challenges to future procurements would arise[.]"). Indeed, even if the agencies were to re-implement the PLA requirements in new solicitations, the parties acknowledged those challenges would necessarily be separate protests beyond the scope of this case. *See* Tr. at 79:22–80:1 ("[THE COURT:] [If] the agency just decides to completely cancel and then resolicit down the road, draft a new solicitation with different factors. Isn't that a new bid protest case? [GOVERNMENT]: Yes. [THE COURT]: So under that situation, separate from PLAs and the executive order issued, [plaintiffs' counsel], wouldn't that just be another bid protest case? [PLAINTIFFS]: It would[.]"). Thus, there is "no reasonable expectation" the government will re-implement the PLA requirements considering the corrective action

"adequately addressed the effects of the challenged action," "was reasonable," and "carried out in good faith." *Chapman*, 490 F.3d at 940 (cleaned up); *see* Tr. at 111:14–113:18, 116:4–11.

At oral argument, plaintiffs urged the Court to find it has authority to grant plaintiffs' requested relief, analogizing the Court's authority to an umpire calling "balls and strikes" at a baseball game. *See* Tr. at 107:22–108:12 ("[PLAINTIFFS:] I view this more not as the Court making policy, but as the Court calling balls and strikes on the other two branches and forcing [them] to come to a proper resolution of the law-making power and the implementation of the law-making power as exists in the Executive Branch."). Building on that analogy, the Court's statutory purview is *only* to call balls and strikes of each incoming pitch. *See* Tr. at 108:5–10 ("THE COURT: Sure, but the calling of a ball or a strike is one individual to each pitch in this Court, and if the Executive Branch goes out of the zone for the ball or the strike, the Court's job is to call the pitch, but not to call the game or the league. It's just one pitch after another."). Despite what plaintiffs may argue, the Court's role is not as league manager nor game rulemaker; the Court only assesses whether a pitch is within the strike zone and the Court already called balls and strikes when it awarded plaintiffs' original requested relief. *See* Tr. at 108:5–10; *see also* Tr. at 107:9–14 ("[THE COURT:] [T]his Court deals with bid protests and uses a scalpel in order to review things for arbitrary and capriciousness. The Executive Branch and Congress use axes or missiles in order to change policies. That's their zone, this is mine. [PLAINTIFFS]: Correct."). Here, the Court "has no reasonable expectation the action would recur" as the Court already "determined the corrective action was reasonable, would be carried out in good faith, and adequately addressed the effects of the challenged action." *Chapman*, 490 F.3d at 940 (cleaned up); *see* Tr. at 111:14–113:18, 116:4–11.

In the words of counsel for MVL, ECC, JCCBG2, and Harper, in an article published after the 19 January 2025 decision, "[t]he dispute is no longer over PLAs. We've already won that battle and the PLAs have been removed." *See* Gov't's Reply, App. at 176–77 (25 Feb. 2025, Law 360 article, "PLA Amendment Moots Contractor Dispute, Government Says"), ECF No. 116-1. As discussed *supra*, plaintiffs prevailed on the merits, the agencies have removed the PLA requirements consistent with the Court's decision, and plaintiffs could not identify any requested relief in their initial protest complaints not already received. As such, the Court's analysis need not go beyond the "threshold jurisdictional issue" of mootness to weigh speculative harm—especially to parties beyond the scope of this case. *See Myers*, 275 F.3d at 1369. Given the lack of factual basis on this record to refute the voluntary cessation exception to escape the threshold jurisdictional issue of mootness—and considering "the relief sought [by plaintiffs] has been granted" on the merits and the agencies' removal of the PLA requirements by cancellation of the solicitations—the Court finds as moot MVL, ECC, JCCBG2, and HPCC's protests of the now-cancelled solicitations and determines the four cases should be dismissed. *See Chapman*, 490 F.3d at 939–40 ("When, during the course of litigation, it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue, the case should generally be dismissed."); *supra* Sections VI.C.1 and VI.C.2; *see also CW*, 46 Fed. Cl. at 558–59 ("This court previously has dismissed a bid protest claim for mootness due to cancellation of the award."); *Madison*, 90 Fed. Cl. at 680 ("[A]s to the mootness impediment, if the cancellation is ultimately upheld by the court, it would obviously render plaintiff's original protest (counts I–III) moot."). For similar reasons, the Court finds as moot Harper and HPCC's protests of the now-amended-solicitations and determines the three

- 31 -

cases should be dismissed. *See Chapman*, 490 F.3d at 939; *supra* Sections VI.C.1 and VI.C.3; *see also CW*, 46 Fed. Cl. at 558–59 ("Dismissal for mootness is warranted here . . . because . . . there is no 'reasonable likelihood' the voluntarily ceased activity will recur and the court can grant no 'effectual relief' to prevent the case from becoming moot." (citing *CCL*, 43 Fed. Cl. at 690)).

        Finally, the government argues "the solicitations at issue in four of the consolidated cases have been cancelled by [the Army Corps] or GSA," making those cases moot given "[t]here is no reasonable expectation that the new solicitations for these construction projects will contain a PLA requirement in violation of the Court's interpretation of CICA, in light of the Court's opinion, DoD's FAR deviation prohibiting DoD entities from requiring PLAs in large-scale construction solicitations, and GSA's class exception to the PLA mandate for land port of entry construction projects." Gov't's MTD at 7–8. "Regarding the other three consolidated cases," the government continues, the "[Army Corps] and NAVFAC have amended the solicitations at issue to remove the PLA requirements," making those protests moot because "Harper and HPCC are now able to compete for the contracts without being subject to PLA requirements," and "[t]here is no reasonable expectation that [the Army Corps] or NAVFAC will reverse course, especially considering DoD's FAR deviation, and, thus, the amendments have completely and irrevocably eradicated the effects of the allegedly illegal PLA requirements." *Id.* at 8. It is well-settled that cancellation of the solicitation at issue moots a bid protest. *See, e.g.*, *Madison*, 90 Fed. Cl. at 680; *CW*, 46 Fed. Cl. at 558–59; *CCL*, 43 Fed. Cl. at 689–90. As the solicitations at issue in four of the consolidated cases have been cancelled by the Army Corps or GSA (*MVL*, No. 24-1057, *ECC*, No. 24-1144, JCCBG2, No. 21-1219, and *HPCC*, No. 24-1461), those cases are moot. *See* Gov't's MTD, App. at 5–12. There is no reasonable expectation that the new solicitations for these construction projects will contain a PLA requirement in violation of the Court's interpretation of CICA, in light of the Court's opinion, DoD's FAR deviation prohibiting DoD entities from requiring PLAs in large-scale construction solicitations, and GSA's class exception to the PLA mandate for land port of entry construction projects (like the construction project at issue in *HPCC*, 24-1461). *See* Gov't's MTD, App. at 1–4. Moreover, if plaintiffs are dissatisfied with future solicitations for these projects, they "may, of course, challenge the new solicitation[s]." *CW*, 46 Fed. Cl. at 559. Regarding the other three consolidated cases (*Harper*, No. 24-1398, *Hensel*, No. 24-1077, and *HPCC*, No. 24-1433), USACE and NAVFAC have amended the solicitations at issue to remove the PLA requirements. *See* Gov't's MTD, App. at 23–165. There is no reasonable expectation the Army Corps or NAVFAC will reverse course, especially considering DoD's FAR deviation, and, thus, the amendments have completely and irrevocably eradicated the effects of the allegedly illegal PLA requirements. *See Chapman*, 490 F.3d at 939–40. Due to these amendments, Harper and HPCC are now able to compete for the contracts without being subject to PLA requirements. *See id.* Accordingly, these seven consolidated protests are moot and must be dismissed. *See Myers*, 275 F.3d at 1369 ("[M]ootness . . . is a threshold jurisdictional issue."); *Gulley*, 150 Fed. Cl. at 413 ("[M]ootness of a case is properly the subject of an RCFC 12(b)(1) motion." (quoting *CBY*, 105 Fed. Cl. at 328)).

## VII.    Tucker Act Jurisdiction for Plaintiffs' Requested Relief

Having determined the mootness of each protest, the Court now decides—in the alternative—whether plaintiffs have demonstrated entitlement to their requested relief. The Court first discusses plaintiffs' post-corrective-action Motion for Permanent Injunction. The Court then analyzes whether plaintiffs' requested relief permissibly falls within the Court's bid protest jurisdiction as outlined by the Tucker Act and applicable precedent. Specifically, the Court examines the parties' arguments related to the Court's jurisdiction to decide the validity of a federal regulation beyond an as-applied ruling affecting only the seven consolidated protests here. Finally, the Court turns to the permanent injunctive relief factors and analyzes whether plaintiffs' have demonstrated entitlement to their requested relief.

### A. Whether the Court's Bid Protest Jurisdiction Extends to Plaintiffs' Requested Relief

Before the Court is plaintiffs' request for "a permanent injunction ordering the Government to rescind Executive Order 14,063, FAR Subpart 22.5, and FAR Clauses 52.222-33 and -34, and take other action as this Court finds appropriate to implement its January 19, 2025 Opinion and Order." Pls.' Mot. for PI at 9; *see* Tr. at 14:13–21 ("[PLAINTIFFS]: The relief that the [p]laintiffs are seeking is an injunction that would rescind the FAR rule and the Biden executive order[.]"). Suggesting the district courts are the proper venue for plaintiffs' request, the government responds, "this Court lacks the authority [to] grant this or any similar relief in a bid protest." *See* Gov't's MTD at 10. Accordingly, the Court first addresses the parties' jurisdictional arguments in greater detail. The Court then examines whether its jurisdiction under the Tucker Act extends to plaintiffs' requested relief given the narrow scope of the 19 January 2025 decision. Finally, the Court compares plaintiffs' exclusive jurisdictional arguments against the government's arguments related to pending district court challenges involving the same EO and regulations.

Although plaintiffs recognize the Court's holding was limited to the consolidated protests, plaintiffs argue the Court also "has the authority to strike down" the EO and implementing FAR regulations "within the context of this case." *See* Tr. at 22:6–13 ("[PLAINTIFFS]: We agree that the Court's holding was *limited* to the 12 solicitations, but we also believe . . . under prevailing caselaw . . . the Court has the authority to strike down the Biden executive order and the Biden FAR rule mandating PLAs *within the context of this case.*" (emphasis added)). When questioned at oral argument on the Court's authority under the Tucker Act, plaintiffs disagreed the Court's jurisdiction is congressionally limited to only the specific protests and parties before the Court. *See* Tr. at 99:24–100:6 ("[THE COURT:] [S]hould the Court . . . disagree with the broadness of the Biden executive order and its implementation as it was explained in the 19 January [O]pinion, the Court is limited to the jurisdiction granted to it by Congress and the review of only the protests that are in front of it, correct? [PLAINTIFFS]: I don't think that's correct."). The government disagreed, arguing an as-applied challenge to a statutory application in a bid protest before the Court is jurisdictionally distinguishable from a facial challenge to a regulation merely associated with a bid protest, which would fall outside of the Court's bid protest jurisdiction. *See* Tr. at 66:2–24 ("THE COURT: Is it fair to say that an as-applied challenge to a statutory application in a protest is in the Court of Federal Claims, versus a facial challenge to a regulation or statute that just happens to be associated with a protest would not be allowed? . . . [GOVERNMENT:] [T]hat's right . . . . [T]he [C]ourt can't

grant relief that's going to actually invalidate a regulation. THE COURT: So applied relief is okay, facial relief not okay? [GOVERNMENT]: Right."). The Court addresses these arguments in turn.

In its recent decision in *Boeing*, the Federal Circuit reviewed the Court of Federal Claims' dismissal of three counts of plaintiff's complaint brought under the CDA rationalizing "the true nature of the action is a challenge to the validity of a FAR regulation and therefore, is not a contract case." 119 F.4th at 23 (cleaned up). Reversing the Court of Federal Claims' decision, the Federal Circuit held plaintiff's challenge to the validity of the FAR provision as part of a CDA claim did not remove the case from the Court of Federal Claims' jurisdiction. *See id.* at 23–25. The Federal Circuit explained the Court of Federal Claims was "correct that, in general, *for actions that do not involve contract-related claims*, the Court of Federal Claims'[] limited jurisdiction under the Tucker Act does not authorize review of pure challenges to the validity of a regulation." *Id.* at 24 (emphasis added). In support of this determination, the Federal Circuit cited two bid protest cases—*Land Shark*, 842 F. App'x 589, and *Southfork*, 141 F.3d at 1135—indicating bid protests are distinguishable from CDA claims for analyzing whether the Court of Federal Claims may determine the validity of a regulation. *See Boeing*, 119 F.4th at 24. Supporting this distinction, the Federal Circuit explained the Court of Federal Claims' "erroneous jurisdictional conclusion to the contrary can easily be explained by its reliance on inapposite case law . . . . [T]he Federal Circuit precedent that the [Court of Federal Claims] relied on did not involve contract disputes properly brought under the Court of Federal Claims'[] exclusive jurisdiction over CDA claims." *Id.* at 25. Plaintiffs interpret *Boeing*'s use of the phrase "exclusive jurisdiction" as meaning "this Court has jurisdiction to hear bid protests *and* has jurisdiction to determine the validity of regulations that are 'inextricably intertwined' with the underlying protest itself." Pls.' Reply at 16 (quoting *Boeing*, 119 F. 4th at 24) (emphasis in original). Further borrowing from the language of *Boeing*, plaintiffs assert they "do not bring a 'pure challenge to the validity of a regulation,' but rather bring a bid protest (on which they have already succeeded)." *Id.* at 18. At oral argument, however, plaintiffs could not clearly articulate how their request here is distinguishable from a "pure challenge" in a district court case given plaintiffs here seek *identical* relief to the relief sought in the pending "pure challenge" district court litigation. *See* Tr. at 95:8–19 ("[THE COURT:] [W]e've already established that your requested relief is the exact same as what's being requested in Florida, which is a pure challenge to the validity of a regulation. . . . [PLAINTIFFS:] [J]ust because the relief that could be granted in the Florida case is the same as the relief that could be granted in this case . . . . there's nothing in either statute that would suggest that this Court is divested of its jurisdiction simply because the relief might be able to be awarded in a district court.").

Even the most expansive reading of *Boeing* must be read in conjunction with the Tucker Act, which permits protests only "by an *interested party* objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation *in connection with a procurement or a proposed procurement*." 28 U.S.C. § 1491(b)(1) (emphasis added). Arguing *future* harm to parties beyond these protests, plaintiffs suggest their alleged "risk of continuing harm" overcomes this statutory limitation, insisting "if this Court doesn't choose to exercise jurisdiction in the way that [p]laintiffs are requesting, the Court is going to be littered with bid protests on every solicitation that has a PLA in it." *See* Tr. at 105:22–106:116 ("[THE COURT:] If its's a

*future* party and a *future* contract . . . how can that be reconciled with 'a particular procurement or proposed procurement,' in which the plaintiff is 'an interested party.' [PLAINTIFFS]: That relates to the cases we've previously discussed about the risk of continuing harm. . . . That would suggest that the Court does have jurisdiction to address in the context of mootness the likelihood of continuing harm, which I think is the real issue in play here. . . . [I]f this Court doesn't choose to exercise jurisdiction in the way that [p]laintiffs are requesting, the Court is going to be littered with bid protests on every solicitation that has a PLA in it. THE COURT: Well, until the agency stops doing that. [PLAINTIFFS]: Yes[.]" (emphasis added)). In support of this policy argument, however, plaintiffs relied on examples from other agencies outside the record and unrelated to these solicitations. *See* Tr. at 108:13–18, 109:12–111:6; *see also supra* Section VI.

Without tethering their requested relief to interested parties and specific procurements, plaintiffs cannot chin the statutory bar by relying only on *future* harm in *future* protests. *See* 28 U.S.C. § 1491(b)(1). Further, *Boeing* must be read with *DGR*, where the Federal Circuit plainly instructed the Court of Federal Claims lacks "the authority to invalidate properly promulgated regulations of an Executive Branch agency" in a bid protest. *See DGR*, 690 F.3d at 1341. Although the language in *Boeing* was less clear than the Federal Circuit's instruction in *DGR*, both cases must be read within the Tucker Act's express limitation of this Court's jurisdiction to challenges of "alleged violation of . . . [a] regulation *in connection with a procurement or a proposed procurement*" brought by "*interested* part[ies]." 28 U.S.C. § 1491(b)(1) (emphasis added).

Plaintiffs, however, read *Boeing* as "provid[ing] no limitation on this Court's ability to review the validity of regulations in the bid protest context," and suggest instead, "[t]he reason *Boeing* did not directly discuss bid protest jurisdiction was because the case on appeal from the lower court was a CDA case and not a bid protest case" even though "both CDA and bid protest jurisdiction are derived from the same law—the Tucker Act." Pls.' Reply at 16–17. While *Boeing* was not a bid protest case, the distinction plaintiffs attempt to draw is inconsequential because *Boeing* does not suggest the Court of Federal Claims could direct the government to rescind a regulation in a CDA case or categorically enjoin the enforcement of a regulation. *See Boeing*, 119 F.4th at 10–27. When questioned on this point at oral argument, plaintiffs could not identify any language in *Boeing* to support its stance the Court can issue a permanent injunction impacting parties beyond these consolidated cases. *See* Tr. at 105:12–21 ("THE COURT: Where in Boeing does the Federal Circuit indicate that this Court could also issue a permanent injunction affecting the parties beyond the consolidated cases? [PLAINTIFFS]: I mean, if the Court has the power to invalidate a regulation, . . . I don't know how else you would do it other than an injunction that rescinded the offending regulation. I mean, I don't think the Federal Circuit is suggesting there that the Court would issue an order[.]"). Under plaintiffs' generous reading of *Boeing*, even if the Court could rescind regulations and executive orders in a bid protest, it would be improper to do so here based on an as-applied decision limited to these specific protests. *See* Tr. at 107:9–108:10 ("[THE COURT:] [T]his Court deals with bid protests and uses a scalpel in order to review things for arbitrary and capriciousness. The Executive Branch and Congress use axes or missiles in order to change policies. That's their zone, this is mine. [PLAINTIFFS]: Correct."). Exceeding the Court's statutory authority to address matters beyond the specific "violation of statute . . . in connection with [these]

procurement[s]" and these "interested part[ies]" is not merely calling a pitch—it is rather stepping out from behind home plate and changing the rules of the game—which is egregiously beyond the Court's statutory purview. *See* 28 U.S.C. § 1491(b)(1); *see also* Tr. at 107:9–108:10 ("THE COURT:  Sure, but the calling of a ball or a strike is one individual to each pitch in this Court, and if the Executive Branch goes out of the zone for the ball or the strike, the Court's job is to call the pitch, but not to call the game or the league.  It's just one pitch after another.").

Moreover, when pressed at oral argument for a case supporting their exclusive jurisdiction assertion, plaintiffs offered *Alphapointe v. Department of Veterans Affairs*, 475 F. Supp. 3d 1 (D.D.C. 2020), a case absent from plaintiffs' briefing. *See* Pls.' Mot. for PI; Pls.' Reply; HPCC's Reply.  Plaintiffs orally cited *Alphapointe* for the proposition that district courts lack jurisdiction to hear APA challenges. *See* Tr. at 52:8–54:24 ("[PLAINTIFFS:]  I think one could more persuasively argue . . . the Court of Federal Claims'[] exclusive jurisdiction over contract and bid protest matters means that there actually is not jurisdiction under the APA for a U.S. District Court challenge.  THE COURT:  Does any case say that?  [PLAINTIFFS]:  There is one we found yesterday . . . .  It's Alphapointe v. Department of Veterans Affairs . . . .  [T]he D.C. District Court has found that they do not have APA jurisdiction, because of the nature of the Court of Federal Claims['] exclusive jurisdiction under the Tucker Act.").  Given plaintiffs' reliance on this case at oral argument to support their exclusive jurisdiction assertion, the Court addresses the applicability of *Alphapointe* to these consolidated protests.  In *Alphapointe*, plaintiffs—two "qualified nonprofit agencies under the AbilityOne Program, a federal program that provides employment opportunities for people who are blind or have other severe disabilities"—had "for many years, provided certain goods and services to the [VA] as a result of statutory preferences afforded to AbilityOne-qualified vendors."  475 F. Supp. 3d at 3.  After "the VA notified [p]laintiffs that it would transition a number of [p]laintiffs' contracts to veteran-owned businesses," under the 2019 Class Deviation—*i.e.*, "a recently announced change to applicable acquisition regulations"—plaintiffs sued, seeking an injunction and arguing:  (1) "the 2019 Class Deviation is arbitrary, capricious, and not in accordance with law because it conflict[ed] with a Federal Circuit opinion that requires the VA to perform what is known as a 'Rule of Two' evaluation before awarding a procurement contract that exceeds $5 million and, if the Rule is satisfied, award the contract to a veteran-owned small business;" and (2) the VA "improperly promulgated the 2019 Class Deviation without subjecting it to notice-and-comment rulemaking."[6]  *Id.* at 3–4.  The court declined to "enjoin the VA from enforcing the 2019 Class Deviation" and granted the government's motions to dismiss as to whether "the VA's issuance of the 2019 Class Deviation issuance was procedurally deficient."  *See id.* at 4, 7.  The court, however, transferred the case to the Court of Federal Claims to determine whether "the 2019 Class Deviation [wa]s arbitrary, capricious, and not in accordance with law," concluding plaintiffs' arbitrary and capricious claim falls within the exclusive jurisdiction of the Court of Federal Claims because plaintiffs alleged a "statutory violation 'in connection with a procurement or a proposed procurement.'"  *See id.* at 9–11.  In doing so, the court held plaintiffs

---

[6] Specifically, plaintiffs claimed the first APA claim—*i.e.*, the 2019 Class Deviation—was "arbitrary, capricious, and not in accordance with law because it disregard[ed]" *PDS Consultants, Inc. v. United States*, 907 F.3d 1345 (Fed. Cir. 2018), "by prioritizing veteran-owned small businesses even where the Rule of Two is not satisfied."  *See Alphapointe*, 475 F. Supp. 3d at 7.  Plaintiffs' second APA claim alleged "the VA's issuance of the 2019 Class Deviation issuance was procedurally deficient because [d]efendants did not follow notice-and-comment rulemaking."  *See id.*  "The third and fourth causes [we]re contract or quasi-contract claims of promissory estoppel and breach of the duty of good faith and fair dealing."  *Id.*

could not "avoid the exclusive jurisdiction of the Court of Federal Claims by casting their cause of action as a general challenge to the 2019 Class Deviation under the APA." *Id.* at 10.

The Court observes *Alphapointe* undermines plaintiffs' argument here, because the court there quoted the Tucker Act while concluding plaintiffs' arbitrary and capricious claim fell within the exclusive jurisdiction of this Court because plaintiffs alleged a "statutory violation 'in connection with a procurement or a proposed procurement." *Id.* at 9 (quoting 28 U.S.C. § 1491(b)). There, the court specifically held "[p]laintiffs cannot avoid the exclusive jurisdiction of the Court of Federal Claims by casting their cause of action as a general challenge to the 2019 Class Deviation under the APA." *See Alphapointe*, 475 F. Supp. 3d at 10. Accordingly, the court transferred the claim to the Court of Federal Claims but retained jurisdiction over plaintiffs' notice-and-comment claim because "the Court of Federal Claims lacks APA jurisdiction and therefore could afford no remedy for the alleged procedural violation." *See id.* at 11 (quoting *Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003)) (cleaned up); *see also McNeil v. United States*, 293 Fed. App'x 758, 760 (Fed. Cir. 2008) ("The Court of Federal Claims lacks the general federal question jurisdiction of the district courts, which would allow it to review an agency's actions and to grant relief pursuant to the Administrative Procedure Act." (quoting *Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997) (cleaned up)).

Plaintiffs premise their requested relief on the assertion this Court holds the "*exclusive* jurisdictional powers" to consider and grant plaintiff's requested relief. *See* Pls.' Mot. for PI at 8 (emphasis added); *see also* Tr. at 93:18–22 ("[PLAINTIFFS:] My reading of Boeing is that . . . a key part of that decision says if the true nature of the dispute is a contract, then the Court of Federal Claims has *exclusive* jurisdiction and has authority to invalidate the regulation." (emphasis added)). Plaintiffs, however, also argue the Court also has *concurrent* jurisdiction with the district courts to grant plaintiffs' requested relief. *See* Tr. at 99:8–13 ("[PLAINTIFFS:] Jurisdiction is always available for review, and the Tucker Act . . . seems very clear that this court, even if it's not exclusive jurisdiction, certainly has concurrent jurisdiction to rule and issue an injunction to invalidate the FAR rule and the executive order on PLAs."). Indeed, litigation percolating in the district courts related to the EO and implementing FAR regulations show plaintiffs are not without an alternate forum for the relief sought here. *See* Tr. at 45:8–11 ("[THE COURT:] [W]ith respect to . . . what the plaintiffs in Florida w[ant], they're asking for the same thing[?] [PLAINTIFFS]: They're asking for the same relief."); *see also First Coast*. Plaintiffs recognize the district courts' authority to hear the EO-related suits has not been challenged, but argue the district courts cannot exercise jurisdiction over those cases. *See* Tr. at 97:19–98:7 ("[THE COURT:] [W]e just established a half an hour ago that the construction company plaintiffs in Florida argued the district court has jurisdiction. The unions in the DDC argued the district court has jurisdiction. And now you're telling me that this Court has exclusive jurisdiction to review the challenge to the validity of the regulation? [PLAINTIFFS]: Well, I don't think anyone has challenged the . . . APA jurisdictional question in . . . the Florida case . . . . THE COURT: Right, everybody just seems to assume [the district courts are] where they go, but you're saying that's wrong? [PLAINTIFFS]: Yes[.]"). While asserting the Court has exclusive jurisdiction to grant their requested relief, plaintiffs purport the "20 or 30 years" of relief sought by plaintiffs in the district courts have been improper. *See* Tr. at 98:9–17 ("[PLAINTIFFS:] [W]e . . . assumed like everyone else in the last 20 or 30 years, that you had to go to the district court to strike down a regulation under the [APA]. It turns out when you

actually look at the text of both the APA and the Tucker Act . . . that is actually an incorrect assumption that has been carried through by a lot of different plaintiffs, defendants, and courts, for years."). Although plaintiffs are asking the Court to take an unprecedented jurisdictional stance—in another attempt by plaintiffs to get the Court to change the rules of the game— plaintiffs fail to articulate what distinguishes these cases as so unique as to warrant such extraordinary relief. *See* Tr. at 98:22–99:8 ("[THE COURT:] [W]hat makes this case so special that in the last 20 years of jurisdiction limited the remedies in the Court of Federal Claims should be revisited? Especially if you already agree that all plaintiffs in this case . . . received all the relief that they requested. . . . [PLAINTIFFS:] I mean, jurisdiction is something that the Court is bound to review even on its own, even notwithstanding that perhaps cases have been wrongly decided for decades."). Plaintiffs' policy arguments go so far as suggesting the Court should exercise jurisdiction here "to streamline litigation in this Court," so *future* protesters may challenge "the validity of federal regulations without needing to file a concurrent action in district court." Pls.' Reply at 16, n.5; *see* Tr. at 106:10–107:8 ("[PLAINTIFFS:] [F]or 35 years, depending on the change of administration we've had, this [is] constantly changing . . . . THE COURT: Those are policy decisions. That's not the decision of a judge to make the policy changes that perhaps different administrations choose to make. [PLAINTIFFS:] It's a policy decision of Congress, though, not the administration. So Congress could pass a statute that mandates PLAs on projects of $35 million or greater."). Plaintiffs' policy arguments, however, cannot justify an exercise of jurisdiction by this Court that contravenes the congressionally drawn contours of the Tucker Act. *See* 28 U.S.C. § 1491(b)(1); *see also Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 188 (2020) ("If policy considerations suggest that the current scheme should be altered, Congress must be the one to do it."); *Land Shark*, 842 F. App'x at 593 ("Challenges to the validity of a regulation governing a procurement must be brought in federal district court under the [APA].").

Given plaintiffs can pursue their requested relief in district courts and *Boeing* is best read within the statutory parameters laid out by Congress in the Tucker Act, the Court declines to change the rules of the game by taking the sweeping action plaintiffs' request. *See* Tr. at 107:9–14 ("THE COURT: Sure, but this Court deals with bid protests and uses a scalpel in order to review things for arbitrary and capriciousness. The Executive Branch and Congress use axes or missiles in order to change policies. That's their zone, this is mine. [PLAINTIFFS:] Correct.").108:10. Indeed, plaintiffs acknowledged if the Court determines the cases are moot or the Court lacks jurisdiction to grant plaintiffs' requested relief, dismissal is warranted. *See* Tr. at 77:12–23 ("[THE COURT:] [I]f the Court determined that it lacked jurisdiction to grant the requested relief related to the future contract issues that you've mentioned, then would you agree that the Court should find the issues, then, in this case moot and dismiss the case? [PLAINTIFFS]: At least as it relates to the . . . four canceled but not yet reissued solicitations[.]"). The Court need not opine on the district courts' authority to hear challenges to federal regulations; rather, it is sufficient for this Court to conclude it lacks jurisdiction to vacate or universally enjoin the EO and related FAR regulations beyond these "interested part[ies]" and these seven consolidated bid protests challenging particular "procurement[s]." *See* 28 U.S.C. § 1491(b)(1). The Court thus determines the only remaining relief plaintiffs seek exceeds the Court's authority and must be dismissed accordingly.[7] *See Brown v. United States*, 105 F.3d

---

[7] Consolidated plaintiffs MVL, ECC, JCCBG2, and Harper seek "a permanent injunction ordering the [g]overnment to rescind [the EO and implementing FAR regulations] *and take other action as this Court finds appropriate to*

621, 624 (Fed. Cir. 1997) (affirming the "proper[] dismiss[al]" of plaintiffs' cases after this Court determined the only remaining claims were requests for injunctive and declaratory relief "outside the jurisdiction of the Court of Federal Claims"); *see also Cooper v. United States*, 860 F. App'x 742, 744 (Fed. Cir. 2021) (per curiam) (addressing this Court's denial of injunctive relief on the basis of lack of subject-matter jurisdiction, the Federal Circuit instructed "the Court of Federal Claims cannot entertain claims for injunctive relief, except in narrowly defined circumstances"); *Ledford v. United States*, 297 F.3d 1378 (Fed. Cir. 2002) (affirming the Court of Federal Claims' dismissal of the case for lack of subject matter jurisdiction over claims for, *inter alia*, injunctive and declaratory relief).

### B. Whether Plaintiffs Have Demonstrated Irreparable Harm

To achieve permanent injunctive relief, plaintiffs must show: "(1) plaintiffs have succeeded on the merits; (2) plaintiffs will suffer irreparable harm if such relief is not granted; (3) the balance of hardships tips in plaintiffs' favor; and (4) an injunction will serve the public interest." *See PGBA*, 389 F.3d at 1228–29 (cleaned up). As explained in the 19 January 2025 decision finding the PLA requirements as applied to the seven solicitations arbitrary and capricious, "plaintiffs have succeeded on the merits of their case, [so] the first factor weighs in their favor." *MVL USA*, 174 Fed. Cl. at 437. Accordingly, the Court addresses whether plaintiffs have met the other three factors required for injunctive relief, beginning with the parties' irreparable harm arguments related to the seven consolidated solicitations.

Even if plaintiffs could demonstrate their protests are not moot, plaintiffs must still show irreparable harm in the absence of an injunction for the Court to grant their requested relief. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) ("Our case law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.,* likelihood of success on the merits *and* irreparable harm." (emphasis added)); *see also Amoco*, 480 U.S. at 546, n.12 ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."). As the Court already determined plaintiffs' protests are moot given they have achieved their requested relief for the reasons discussed *supra* Section VI, the only *evidence* plaintiffs rely on to support their irreparable harm arguments is an absence of affirmative representations from the agencies that the PLA requirements will not be re-instated. *See* Tr. at 118:17–120:1 ("THE COURT: For HPCC, what facts does HPCC plead indicating that an irreparable injury is likely in the absence of an injunction? [PLAINTIFFS]: Well, the fact that the risk of the illegal use of the PLA remains a real possibility. THE COURT: But based on what *evidence*? [PLAINTIFFS]: The fact that . . . neither Army Corps [n]or NAVFAC have said, we are not going back on this. In fact, they have, rather, sort of declined to do that, and instead said, it's unlikely[.]" (emphasis added)); *see also* Tr. at 30:4–9, 35:9–12, 41:19–23, 76:25–77:11, 81:14–

---

*implement its January 19, 2025 Order.*" *See* Pls.' Mot. for PI at 9 (emphasis added). The Court notes its 19 January 2025 decision permitted the agencies time to take corrective action consistent with the Court's decision—which is the same corrective action plaintiffs agree rendered moot the requested relief in their respective complaints as discussed *supra* Section VII. Given the agencies removed the PLA requirements from each of the challenged solicitations consistent with the Court's decision, there is no additional action required of the agencies to "implement" the Court's decision.

82:10, 109:23–111:6.  Furthermore, a week after oral argument in this case, DoD revised the class deviation to clarify the "class deviation is needed to ensure contracting officers are able to award contracts for Federal large-scale construction projects in according with [the Court's] MVL decision."  *See* Gov't's Notice, Revised DoD Class Deviation (23 Apr. 2025 Class Deviation—Waiver of Project Labor Agreements) at 1 ("Effective immediately, this class deviation revises and supersedes Class Deviation 2025-O0002, issued on February 7, 2025.").  Additionally, plaintiffs recognize the Court's decision applies to each agency and solicitation at issue here, regardless of the class exception and class deviation.  *See* Tr. at 119:19–25; *see also* Tr. at 30:4–9, 35:9–12, 41:19–23, 76:25–77:11, 81:14–82:10, 109:23–111:6.  Further, when speculating the agencies "could make a second run at" implementing the PLA requirements, plaintiffs could offer no justification why the agencies "would want to" do that.  *See* Tr. at 120:6–10; *see also* Tr. at 30:4–9, 35:9–12, 41:19–23, 76:25–77:11, 81:14–82:10, 109:23–111:6.  Given plaintiffs' success on the merits here, plaintiffs are not entirely without recourse if they seek to challenge future agency action that they believe violates CICA, as they may file a future bid protest in this Court.  *See CW*, 46 Fed. Cl. at 559 ("Should the new solicitation not satisfactorily address plaintiff's (or others') concerns, plaintiff (or others) may, of course, challenge the new solicitation.").

According to plaintiffs, "[a]bsent permanent injunctive relief, [p]laintiffs will suffer irreparable harm *if* the [g]overnment continues to mandate through the FAR that procurement agencies include the unlawful PLA [r]equirements in *all* large-scale construction solicitations on which [p]laintiffs *may* bid in the *future*."[8]  Pls.' Mot. for PI at 8 (emphasis added).  Plaintiffs, however, fail to recognize it is insufficient to argue the mere "possibility" of irreparable injury; rather, they must "demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original).  Merely speculating the agencies *could* reinstate the PLA requirements into the amended and cancelled solicitations is insufficient to show such action is "likely."  *See id.*; *see also* Tr. at 111:14–113:18 (demonstrating plaintiffs fail to offer any concrete evidence of future harm and agree with the Court "anything could occur in the future").  Further, "injunctions are to be used sparingly," and "injunctive relief should be narrowly tailored to fit the *specific* legal violations."  *See SAGAM Securite Senegal v. United States*, No. 2021-2279, 2023 WL 6632915, at *7 (Fed. Cir. Oct. 12, 2023) (emphasis added) (quoting *Gemveto Jewelry Co. v. Jeff Cooper Inc.*, 800 F.2d 256, 259 (Fed. Cir. 1986)); *see also Gill v. Whitford*, 585 U.S. 48, 66 (2018) ("A plaintiff's remedy must be limited to the inadequacy that produced his injury in fact." (cleaned up)).  Yet, plaintiffs claim "[a]n injunction limited only to the solicitations involved in this litigation would not fully redress [p]laintiffs' harm."  Pls.' Mot. for PI at 8.  Plaintiffs, however, confirmed at oral argument plaintiffs only allege *future* harm here, *unrelated* to the current statuses of the seven remaining procurements.  *See* Tr. at 55:24–56:4 ("THE COURT:  Just to confirm, related to the relief

---

[8] Although HPCC did not join MVL, ECC, JCCBG2, and Harper in filing the Motion for Permanent Injunction, the Motion noted in a footnote:  "HPCC agrees with consolidated plaintiffs MVL, ECC, JCCBG2, and Harper with respect to the request for a permanent injunction as set forth herein."  *See* Pls.' Mot. for PI at 1, n.1.  At oral argument, HPCC confirmed HPCC "adopts by reference" consolidated plaintiffs' permanent injunction arguments.  *See* Tr. at 16:3–11 ("THE COURT:  Looking at page 1, footnote 1, of the motion for permanent injunction, you stated, 'HPCC agrees with consolidated [p]laintiffs . . . with respect to the request for a permanent injunction.'  Related to HPCC, does this mean that HPCC adopts, by reference, the consolidated [p]laintiffs' arguments in the motion in addition to HPCC's own response?  [HPCC]:  Yes, Your Honor.").  Accordingly, the Court's analysis of plaintiffs' Motion applies to all consolidated plaintiffs, including HPCC.

requested for the 12 protests here, the argument is with respect to future harm only, correct? [PLAINTIFFS]: That is correct. It *does not relate* to the current status of the procurements. As it stands currently, all 12 PLAs have been removed." (emphasis added)). Additionally, as discussed *supra* Sections VII, plaintiffs confirmed there is no record evidence indicating the agencies intend to violate the 19 January 2025 decision, and the government represented it "couldn't go back" on the already-taken corrective action, has demonstrated no plans to reinstate the PLA requirements, and intends to follow the Court's decision—thereby further eliminating any *reasonable expectation* plaintiffs will be harmed by alleged future PLA re-implementation. *See* Tr. at 30:4–9, 35:9–12, 41:19–23, 76:25–77:11, 81:14–82:10, 109:23–111:6, 111:14–113:18; *see also Winter*, 555 U.S. at 22.

As plaintiffs cannot demonstrate irreparable harm is *likely* to befall these *specific* plaintiffs in the absence of a permanent injunction, and given plaintiffs achieved their requested relief following the 19 January 2025 decision and the removal of the PLA requirements, the Court's analysis must end here. *See Amazon.com*, 239 F.3d at 1350 ("Our case law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.,* likelihood of success on the merits *and* irreparable harm." (emphasis added)). After all, there are no more balls or strikes left for the Court to call. *See* Tr. at 107:9–108:4. Even if the Court *could* direct the recission of regulations and executive orders, there is *no basis* here for the Court to grant plaintiffs the "drastic and extraordinary remedy" of a permanent injunction without a showing of irreparable harm. *See SAGAM*, 2023 WL 6632915 at *7 ("An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course, and if a less drastic remedy is sufficient to address the relevant injury, no recourse to the additional and extraordinary relief of an injunction is warranted." (cleaned up)); *see also Gill*, 585 U.S. at 66 ("A plaintiff's remedy must be limited to the inadequacy that produced his injury in fact." (cleaned up)).

## VIII.  Conclusion

For the foregoing reasons, the Court **DENIES** plaintiffs' Motion for Permanent Injunction, ECF No. 111, and HPCC's Motion for Permanent Injunction, ECF No. 115, and **GRANTS** the government's Motion to Dismiss, ECF No. 112. Accordingly, the Court **DISMISSES**[9] plaintiffs' Complaints. The Clerk's Office is **DIRECTED** to enter judgment dismissing plaintiffs' seven consolidated cases consistent with this Order.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge

---

[9] At oral argument, the parties agreed if the Court were to deny plaintiffs' Motion for Injunctive relief, as the Court does so here, there would be no issues remaining. *See* Tr. at 76:21–24 ("[THE COURT:] [I]f the Court were to deny plaintiffs' requested relief, is it the government's position that the case should be entirely dismissed? [GOVERNMENT]: Yes."), 114:16–19 ("[THE COURT:] [I]f the Court were to deny [p]laintiffs' motion for a permanent injunction, would there be any issues left for the Court? [PLAINTIFFS]: Not that I can think of.").